UNITED STATES, Appellee,

v.

Nathaniel W. STUCKEY, Private, U. S. Army, Appellant.

Dkt. No. 35,176.
CM 432641/G.

U. S. Court of Military Appeals.

March 30, 1981.

For Appellant: *Captain James F. Nagle* (argued); *Colonel Edward S. Adamkewicz, Jr., Lieutenant Colonel John F. Lymburner, Major Benjamin A. Sims, Major Charles A. Byler, Captain Willard E. Nyman, III, Captain James Recasner* (on brief); *Colonel Robert B. Clarke, Captain Buren R. Shields, III, Captain Julius Rothlein.*

For Appellee: *Major Douglas P. Franklin* (argued); *Colonel Thomas H. Davis, Colonel R. R. Boller, Major Ted B. Borek* (on brief); *Major Steven M. Werner, Major David McNeill, Jr., Captain Paul G. Thomson.*

*Opinion*

EVERETT, Chief Judge:

A general court-martial convened at Fort Meade, Maryland, found the appellant guilty of unpremeditated murder, auto theft, and robbery, in violation of Articles 118, 121, and 122 of the Uniform Code of Military Justice, 10 U.S.C. §§ 918, 921, and 922, respectively. His sentence to a dishonorable discharge, confinement at hard labor for 50 years, total forfeitures, and reduction to the lowest enlisted grade was approved by the convening authority. After the United States Army Court of Military Review affirmed the findings and sentence, the accused's petition for review was granted by this Court on these two issues:

(1) Whether the officer authorizing the searches failed to meet the neutral and detached magistrate requirement as he was the appellant's company commander?

(2) Whether evidence seized in searches without oath or affirmation under the Fourth Amendment was inadmissible at trial?

I

We need not recite the facts in order to dispose of these two issues. As to the first, *United States v. Ezell*, 6 M.J. 307 (C.M.A.1979), is decisive against the appellant. Since the questioned search occurred in 1974, appellant must also lose on the second issue if we adhere to the position taken in *United States v. Fimmano*, 8 M.J. 197 (C.M.A.1980), *reconsideration not granted by equally divided vote*, 9 M.J. 256 (C.M.A.1980), where only prospective effect was given to the requirement that a commander's authorization for search be based on probable cause established upon oath or affirmation.

The relevant criteria for prospective application

implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards.

*Stovall v. Denno,* 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967). Since a principal purpose of excluding evidence obtained by unreasonable search and seizure is to deter future police misconduct, little is accomplished by retroactively applying new rules concerning search and seizure, for deterrence is not effectively promoted by invalidating acts that were valid when they took place. Thus, not surprisingly, the Supreme Court has generally acted prospectively when establishing new limitations on searches and seizures. *See Williams v. United States,* 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971); *Kaiser v. New York,* 394 U.S. 280, 89 S.Ct. 1044, 22 L.Ed.2d 274 (1969); *Desist v. United States,* 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969); *Fuller v. Alaska,* 393 U.S. 80, 89 S.Ct. 61, 21 L.Ed.2d 212 (1968); *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).

■ In *Fimmano,* Judge Perry's opinion acknowledged that "[t]his Court has previously held that information presented to the official who authorizes searches and seizures need not be under oath or affirmation." 8 M.J. at 197–98. Judge Cook's dissent complained that "two centuries of military practice and nearly three decades of decision in this Court" were being wiped out. 8 M.J. at 206. Under such circumstances law enforcement authorities could justifiably rely "on the old standards." Even though—long before *Fimmano*—the Army had instituted an extensive reliance on affidavits as a basis for the issuance of warrants to conduct military searches and seizures,[1] it still is evident that retroactive application of the oath requirement might have a significant impact on military justice and require setting aside many convictions. Accordingly, despite the able argument of appellate defense counsel to the contrary, there is no occasion to apply retroactively the *Fimmano* requirement of an oath.

## II

According to one view, *Fimmano* never became a viable precedent for other cases.[2] In any event, *Fimmano* is no more sacred a precedent than the earlier opinions of this Court which it overruled. Thus, we shall address the basic issue to which the opinions in *Fimmano* were directed.

■ The time is long past when scholars disputed the applicability of the Bill of Rights to service personnel.[3] Instead, our premise must be "that the Bill of Rights applies with full force to men and women in the military service unless any given protection is, expressly or by necessary implication, inapplicable" and, therefore, that the Fourth Amendment does shield the American serviceperson. *United States v. Middleton,* 10 M.J. 123, 126 (C.M.A.1981) (footnote omitted); *United States v. Ezell, supra* at 313; *United States v. Hartsook,* 15 U.S.C. M.A. 291, 35 C.M.R. 263 (1965).

The Fourth Amendment protects "against unreasonable searches and seizures" and directs that "no Warrants shall issue, but upon probable cause supported by Oath or affirmation." The Supreme Court has used a broad definition of "searches and seizures." Electronic surveillance is a search for and seizure of words, *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); administrative inspections are "searches," *See v. Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); and a stop and frisk also falls within the purview of the Fourth Amendment, *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

However, while interpreting the Fourth Amendment broadly, the Supreme Court

---

1. *See* Chapter 14, AR 27–10; Moyer, *Justice and the Military,* § 2–142 (1972).

2. *See* Memorandum of Everett, C. J., declining to participate in ruling on the motion for reconsideration in *United States v. Fimmano,* 9 M.J. 256 (C.M.A.1980).

3. *Compare* Henderson, *Courts-Martial and the Constitution: The Original Understanding,* 71 Harv.L.Rev. 293 (1957), *with* Weiner, *Courts-Martial and the Bill of Rights: The Original Practice,* 72 Harv.L.Rev. 1, and 266 (1958).

also has been flexible in its manner of application. It has been established that some searches and seizures are "reasonable" even though they have not been authorized by a warrant. *See United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (arrest in a public place without exigent circumstances); *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973) (fingernail scrapings taken from suspect without formal arrest); *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (search of person incident to lawful arrest); *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (hot pursuit); *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (search of an automobile); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) (search of an automobile). In such instances, the law enforcement agents usually still must have probable cause for the search and seizure. *Brinegar v. United States, supra; Carroll v. United States, supra.* But this does not require that the probable cause be based on evidence admissible at trial. *Jones v. United States*, 362 U.S. 257, 270, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960); *Brinegar v. United States, supra.* Indeed, the Court emphasized in *Brinegar*:

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.

338 U.S. at 175, 69 S.Ct. at 1310. *See Adams v. Williams*, 407 U.S. 143, 149, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972).

Moreover, in a different context the concept of probable cause has itself been modified to fit a particular need. *See v. Seattle, supra; Camara v. Municipal Court, supra* (administrative inspections).

Furthermore, in some instances a search and seizure is reasonable even despite the absence of probable cause. Thus, in *Terry v. Ohio, supra*, the Supreme Court ruled that a stop and frisk falls within the purview of the Fourth Amendment but may be reasonable even though "probable cause" is lacking. *See Adams v. Williams, supra.*

Although the Fourth Amendment requires that a warrant be issued "upon probable cause, supported by Oath or affirmation," the Court has ruled that a warrant may be based on an affidavit containing extensive hearsay from unsworn declarants. *Jones v. United States, supra.* Sometimes the declarant is unidentified. *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *cf. McCray v. Illinois*, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967). Moreover, in some instances a court may order a search or seizure without requiring establishment of traditional probable cause. An administrative inspection is predicated on a different breed of probable cause. *See v. Seattle, supra; Camara v. Municipal Court, supra.* A dictum in *Davis v. Mississippi*, 394 U.S. 721, 727, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969), has been construed as supporting the proposition that carefully prescribed procedures for obtaining fingerprints, measurements, blood and urine samples, saliva, hair and voice samples, handwriting exemplars, photographs and lineups without traditional probable cause to arrest "are constitutionally sound."[4] In *United States v. Abel*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), the Supreme Court upheld an arrest made

---

4. Official Commentary to Article 14 of the General Statutes of North Carolina, §§ 15A–271 to 15A–282. The Commentary to Article 170, entitled Order to Appear for Identification Purposes, of the A.L.I. Model Code of Pre-Arraignment Procedure, Proposed Official Draft, Complete Text and Commentary, pp. 462–64, 482–84 (April 15, 1975) contains a similar viewpoint. *See* generally Rule 41.1 entitled Nontestimonial Identification, in the Proposed Amendments to the Federal Rules of Criminal Procedure, April 1971, reported at 52 F.R.D. 462–72. The Advisory Committee Note to this proposed rule is especially instructive. *Id.* at 467–70. *See also United States v. Greene*, 429 F.2d 193, 197 n. 7 (D.C.Cir.1970); *In re Fingerprinting of M. B.*, 125 N.J.Super. 115, 309 A.2d 3, 5 (1973); *Wise v. Murphy*, 275 A.2d 205, 216 (D.C.Ct. App.1971).

pursuant to an "administrative warrant," *id.* at 226, 80 S.Ct. at 690, which was not a judicial warrant within the scope of the Fourth Amendment. *See United States v. Watson, supra* at 417, 96 S.Ct. at 824.

The Supreme Court has displayed a strong preference for use of a warrant procedure where it is feasible to do so. Thus, in *United States v. Ventresca,* 380 U.S. 102, 106, 85 S.Ct. 741, 744, 13 L.Ed.2d 684 (1965), it was observed:

> In *Jones v. United States,* 362 U.S. 257, 270, 80 S.Ct. 725, [735] 4 L.Ed.2d 697, 707, 78 A.L.R.2d 233, this Court, strongly supporting the preference to be accorded searches under a warrant, indicated that in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall. In *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436, and *Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828, the Court, in condemning searches by officers who invaded premises without a warrant, plainly intimated that had the proper course of obtaining a warrant from a magistrate been followed and had the magistrate on the same evidence available to the police made a finding of probable cause, the search under the warrant would have been sustained.

Indeed, in *Camara* the Court adapted the concept of "probable cause" so that a warrant procedure would be feasible. 387 U.S. at 534–39, 87 S.Ct. at 1733–36.

Nonetheless, in determining which searches and seizures are reasonable, the Court has not invariably held that judicial authorization is required unless this is precluded by "exigent circumstances." Thus, in *United States v. Watson, supra* at 423–24, 96 S.Ct. at 827–828, the Court announced:

> Congress has plainly decided against conditioning warrantless arrest power on proof of exigent circumstances. Law enforcement officers may find it wise to seek arrest warrants where practicable to do so, and their judgments about probable cause may be more readily accepted where backed by a warrant issued by a magistrate. See *United States v. Ventresca,* 380 U.S. 102, 106, 85 S.Ct. 741, 744–745, 13 L.Ed.2d 684 (1965); *Aguilar v. Texas,* 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964); *Wong Sun v. United States,* 371 U.S. 471, 479–480, 83 S.Ct. 407, 412–413, 9 L.Ed.2d 441 (1963). But we decline to transform this judicial preference into a constitutional rule when the judgment of the Nation and Congress has for so long been to authorize warrantless public arrests on probable cause rather than to encumber criminal prosecutions with endless litigation with respect to the existence of exigent circumstances, whether it was practicable to get a warrant, whether the suspect was about to flee, and the like.[5]

5. Of course, *Watson* involved a warrantless arrest and a search incident thereto. In *United States v. Rabinowitz,* 339 U.S. 56, 66, 70 S.Ct. 430, 435, 94 L.Ed. 653 (1950), the Supreme Court stated that the question "is not whether it is reasonable to procure a search warrant, but whether the search was reasonable." This statement was repeated in *Cooper v. California,* 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967), where a car had been searched without a warrant a week after its impoundment. However, in overruling *Rabinowitz,* the Supreme Court pointed out that, in *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968), it had said that "the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure." *Chimel v. California,* 395 U.S. 752, 762, 89 S.Ct. 2034, 2039, 23 L.Ed.2d 685 (1969). Then, in *Chambers v. Maroney,* 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970), the Court—while stating that "[o]nly in exigent circumstances will the judgment of the police as to probable cause serve as a sufficient authorization for a search"—looked at "practical consequences," *id.* at 52, 90 S.Ct. at 1981, and upheld a thorough search of an automobile performed at a police station some time after the vehicle had been stopped on the highway. The Court explained, in *South Dakota v. Opperman,* 428 U.S. 364, 367, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976) (footnote omitted), that such a search of automobiles, even in the absence of exigent circumstance, was permissible under "less rigorous warrant requirements ... because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." In *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), the Court cited

Whether dealing with warrantless searches or those performed under court order, the Supreme Court has increasingly emphasized the reasonable expectations of privacy of the person asserting the Fourth Amendment claim. Sometimes this emphasis has produced an extension of the Fourth Amendment protection. Thus, in *Katz v. United States, supra,* the Court concluded that the expectations of privacy entertained by a person talking in a public telephone booth required protection from electronic surveillance of his conversations. Recently, however, the lack of a reasonable expectation of privacy has been used to justify rejection of several complaints against allegedly unreasonable searches. Thus, installation of a pen register is not a search, because a telephone subscriber has no reasonable expectation of privacy in the telephone numbers that he dials. *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); *cf. United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). An allegedly unreasonable search of a car cannot be contested by one who is only a passenger, since he lacks a reasonable expectation of privacy as to that car. *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1979). And someone who slips narcotics into the purse of a friend cannot contest the legality of a search of the purse, since he lacks any reasonable expectation of privacy as to its contents. *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).

Having identified these basic themes in the Supreme Court's interpretation of the Fourth Amendment, we next examine their counterparts in the military law of search and seizure.

Not until 1949 did a Manual for Courts-Martial discuss searches and seizures. However, long before that time military

law had dealt with the subject. As early as 1924, The Judge Advocate General of the Army gave an opinion that:

(27) Property seized without warrant. —Search, by a member of the military police, of a soldier's private dwelling, not on a military reservation, without the soldier's consent and without a search warrant, and seizure therein of property believed to have been stolen are illegal and an unwarranted invasion of the soldier's constitutional rights; and upon a subsequent prosecution of such soldier for larceny, the property so seized is not admissible in evidence. CM 161760

Dig. Ops. JAG, 1912–40, § 395(27). On July 23, 1930, The Judge Advocate General stated in an opinion:

Authority to make, or order, an inspection or search of a member of the military establishment, or of a public building in a place under military control, even though occupied as an office or as living quarters by a member of the military establishment, always has been regarded as indispensable to the maintenance of good order and discipline in any military command * * * such a search is not unreasonable and therefore not unlawful. J.A.G. 250.413.

*See* CM 248379, *Wilson,* 31 BR 231, 235 (1944).

The earliest military judicial decision on search and seizure that we have located was rendered in September 1931, when a conviction was set aside in part by the Board of Review because of a Fourth Amendment violation, even though no objection on this ground had been made at trial. CM 196526, *Ray,* 3 BR 19. The opinion did not discuss or summarize the evidence in the case. After The Judge Advocate General approved the decision of the Board of Review, the convening authority submitted an extensive

---

*Cooper v. California, supra,* in upholding a search of the defendant's clothing which had taken place on the morning after his arrest; four dissenting Justices argued that "[t]he police had ample time to seek a warrant, and no exigent circumstances were present to excuse their failure to do so." 415 U.S. at 811, 94 S.Ct. at 1241. In the context of border

searches and their functional equivalents, there is no requirement of a warrant or of the presence of exigent circumstances; indeed, there need not even be a showing of probable cause. *See United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 612 (1977); *United States v. Rivera,* 4 M.J. 215 (C.M.A.1978).

memorandum seeking reconsideration of the decision. He argued that the right against unreasonable searches and seizures does not apply to a member of the Armed Services "when [searches are] made in pursuance of the appropriate administration and discipline of the Army." *Id.* at 22. Support for this view was derived from the failure of Congress to provide safeguards against unreasonable searches and seizures when in Articles of War 24 and 40 it had granted express protection against self-incrimination and double jeopardy. The convening authority relied on Supreme Court opinions holding that due process for military persons is furnished solely by military laws and regulations.[6] Under this view the Bill of Rights applies only to Article III courts, rather than to courts-martial. Finally, the convening authority pointed out that in the State where the accused had been tried, no exclusionary rule was applied. Notwithstanding these contentions, the decision of the Board was not reconsidered since this was "not permissible." 3 BR at 25.

In 1933, the Board of Review disposed of a search question by observing that "the quarters searched were public quarters on a military reservation and were subject to search upon reasonable grounds. Dig. Ops. JAG 1912–1930, sec. 1304(2)." CM 199465, *Lichtenberger*, 4 BR 81, 99, 135 (1933).

In a later case seizure of fragments of papers from a trash basket in quarters located in an officers' club was challenged as a violation of the Fourth Amendment. The Board of Review in 1934 rejected this argument for several reasons—among which was this:

> a. The Judge Advocate General has held that the commanding officer of any person subject to military law, by virtue of the authority and control which he has as commanding officer, may enter the quarters of an officer or soldier on a military reservation without permission of the accused and conduct a search therein, and that evidence so obtained is

admissible. JAG 250.413, July 23, 1930; CM 171626, Cutchin. In other words, the protection which the Constitution throws around the dwelling of a private individual or even of a military person off a reservation does not extend to public quarters on a military reservation.

It should be noted that during closing argument the defense had abandoned its objection in this case. CM 201878, *Bashein*, 5 B.R. 303, 310.

Four years later the Board relied on JAG Opinion 250.413 and on *Bashein* in holding:

> The Judge Advocate General has held that a search, by order of a competent commander, of public quarters occupied by an enlisted man on a military reservation, the order having been issued in the exercise of a sound discretion, was not "unreasonable" within the meaning of the search and seizure clause of the Fourth Amendment.

CM 209952, *Berry*, 9 BR 155, 167–68 (1938).

In 1943 the Board of Review dealt with a search of the accused's quarters "in a private dwelling" by two Army officers, one of whom leased the house with the accused. This other officer had a room in the house separate from the accused. Items were found in the accused's closet and in a locker bag. At trial the defense sought to have this evidence ruled inadmissible because it was obtained in violation of the Fourth Amendment. The authority for their view included the 1924 opinion of The Judge Advocate General. The Board of Review discussed this 1924 ruling in this manner:

> Obviously, the case relied upon by the defense is based upon the assumption that the provisions of the Fourth Amendment protect the soldier from abusive search and seizure by military authorities in the same manner that it seeks to protect the private citizen from unlawful search and seizure by agents of the Federal Government.

The Board declined to speak on the validity of this ruling which it concluded was inap-

6. *United States ex rel. French v. Weeks*, 259 U.S. 326, 42 S.Ct. 505, 66 L.Ed. 965 (1922) and *Reaves v. Ainsworth*, 219 U.S. 296, 31 S.Ct. 230, 55 L.Ed. 225 (1911).

plicable since "the search . . . was conducted by officers who were not a part of a military law enforcement group" and were acting only in their private capacities. Accordingly, under "the Federal rule" exclusion of the evidence was not required. CM 242312, *Gilbert*, 27 BR 35, 37, 40, 41.[7]

Also, in another 1943 case the Board of Review dismissed any claim of a Fourth Amendment violation simply by noting, "The immunity from searches and seizures guaranteed by the Fourth Amendment to the Constitution does not extend to premises on military reservations (Dig. Ops. JAG 1912–1940, sec. 395(27))." CM 244713, *Kemerer*, 28 BR 393, 403.

Another case concerned a search of military quarters off post which had been conducted without a warrant. The accused's footlocker had been opened by him at the request of his commander and a number of articles were seized. Defense counsel objected to receipt of the seized evidence on grounds of violation of the Fourth Amendment. In holding that this "objection was properly overruled," the Board of Review relied on The Judge Advocate General's Opinion of July 23, 1930, JAG 250.413. CM 248379, *Wilson*, 31 BR 231, 235 (1944).

Even though the accused had pleaded guilty and so did not object to introduction of evidence obtained without a search warrant by the Provost Marshal from a Railway Express Office, the Board of Review made these comments:

It is of course axiomatic that searches and seizures affecting military personnel outside of the limits of a military reservation are subject to the requirements and restrictions imposed by the Fourth and Fifth Amendments to the Federal Constitution. The general rule is that a search and seizure made without a search warrant will be sustained only when (1) it is incident to a lawful arrest, or (2) when the property itself by reason of its physical characteristics furnishes credible evidence of the commission of a crime, or (3) when reliable information of a violation

of the law is received and immediate action is imperative because of the exigencies of the situation.
*Husty v. United States*, 282 U.S. 694, 51 S.Ct. 240, 75 L.Ed. 629 (1930) and *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, are authority for this third proposition.

The Board held the search was "reasonable and lawful" in view of "indications" that the third proposition listed above was satisfied. CM 264149, *Engelhardt*, 42 BR 23, 25 (1944).

The Board of Review, in May 1947, upheld a warrantless search of the accused's government quarters on these grounds:

A search of Government quarters, authorized by the commanding officer having jurisdiction over the locality where such quarters are situated, is legal. Such authorization is the equivalent of a search warrant, the commanding officer being responsible for and having control over the personnel and property in his charge. It is obvious that the commanding officer need not make the search himself nor need he prescribe the specific manner of conducting it.

CM 319591, *Pogue*, 68 BR 385, 393 (1947).

In 1947 a Board of Review discussed the Standing Operating Procedure which governed the procedure for searches and seizures by United States Army law enforcement agencies in the American occupied zone of Germany. CM 326147, *Nagle*, 75 BR 159, 168. This procedure provided:

2. *Search and Seizure. a.* Before a search of any person or his billet or residence is made, the law enforcement agent should have reasonable grounds for believing that the person subject to search has property on his person or in his billet or residence, the possession of which is unlawful, or has property which is needed as evidence to complete the investigation of a serious crime. If either of these circumstances exists and a search is deemed necessary, the following procedure should be used.

---

7. In ACM 1144, *Darby*, 2 CMR (AF) 200 (1949), the Board of Review declined to follow this case since the language of the 1949 Manual differed from that of the 1928 Manual.

*b.* (1) In the case of an officer or enlisted man, consent for the search should be obtained, if practicable, from the person's commanding officer. In the case of a US civilian or Allied civilian employed by the US, consent should be obtained, if practicable, from the person's immediate officer supervisor. In the case of a dependent, consent for the search should be obtained, if practicable, from the commanding officer or officer supervisor of the person on whom he or she is dependent. In all cases, however, some responsible person should be present when the search is made.

Compliance with this directive was in issue in connection with introduction in evidence of a marriage certificate. During an investigation ordered by the Commanding General, the Air Inspector had directed that the Criminal Investigation Division (CID) obtain some documents relating to the accused. Accordingly, two CID agents and a military policeman went to a civilian residence in a German town and received the marriage certificate from an occupant of the house. This document had been located in the accused's part of the residence. The Board of Review held the certificate was properly admitted since it had been obtained in compliance with the Standard Operating Procedure.

The validity of searches conducted in occupied Japan was governed by Circular 6, Headquarters Eighth Army, January 26, 1948, which provided:

2. Policy.

a. It is the policy of the Occupation in Japan that arrests, entries, searches and seizures shall be conducted in a manner reasonably calculated to effect the arrest, entry, search or seizure with the minimum infringement upon rights of privacy, person, property and home, as traditionally protected under American law.

\* \* \* \* \* \*

4. Exercise of authority for the issue of warrants.

a. The Commanding Officer of a military or naval camp, post, installation or reservation may prescribe the method with or without warrants to effect an arrest, entry, search or seizure within the bounds of his camp, post, installation or reservation;

b. In case a warrant of search is to be executed outside the bounds of a military or naval camp, post, installation or reservation:

(1) A warrant of search of a place in possession or control of a person subject to military law will be issued upon the authority of a general officer or a flag officer, . . .

5. Issue of warrants.

a. By military authorities.

\* \* \* \* \* \*

(2) A warrant of search will be issued upon reasonable cause, stated upon affirmation or oath, describing with particularity the object of the search, the place to be searched and things to be seized.

In a case considered by the Board of Review the accused lived in part of a building which was otherwise used "for military purposes" by the Occupation Forces. This building had been a department store and was located in the heart of Tokyo. The accused's quarters—which "could properly be considered as either being on or off a military post"—were searched pursuant to a "search warrant" issued by a general officer. The Board of Review held the issuance of the warrant was valid under paragraph 4 of the Circular. CM 335526, *Tooze*, 3 BR (Army) 313, 346–47 (1949).

An Air Force Board of Review acknowledged the holding in *United States v. Engelhardt, supra*, that the Fourth Amendment applies to off post searches affecting military personnel, but characterized the proposition as "not free from some doubt." The search then at issue was held valid. ACM 1254, *McKinney*, 1 CMR (AF) 625, 634 (1949).

A little more than two months later a different Air Force Board of Review held a search of off-base quarters invalid because it was made "in direct violation of accused's constitutional rights"; and the Board ruled

that "evidence obtained by such illegal means must be suppressed," despite the absence at trial of any objection to admission of the seized items, ACM 1144, *Darby*, 2 CMR (AF) 200, 205, 208 (1949).

From the foregoing precedents it appears that military tribunals probably granted accused military persons protection from unreasonable searches and seizures that occurred off-post; but as to on-post searches the premise was that a commander basically could order such searches as he saw fit by reason of his general control over the area to be searched. The 1949 Manual for Courts-Martial [8] did not deal explicitly with this question in paragraph 138 which concerned unreasonable searches and seizures, but it provided that evidence was inadmissible if "obtained as a result of an unlawful search (see 18 USC 2236) of the property of an accused conducted or instigated by persons acting under authority of the United States." The Manual then explained:

A search of property owned or controlled by the United States or located in a foreign country or in occupied territory and occupied or used by persons subject to military law or to the law of war, which search has been authorized by the commanding officer having jurisdiction over the locality where the property is situated or, if the property is situated in a foreign country or in occupied territory, over personnel subject to military law or to the law of war in such locality, is lawful.

According to the Judicial Council of the Air Force, the intent of the 1949 Manual was "to make the rules of evidence applied in courts-martial pertaining to searches of property identical with the rules of evidence as applied in Federal district courts, except as to the exceptions contained in paragraph 138." *United States v. Worley*, 3 CMR (AF) 424, 439 (1950).[9] As to the commander's power to authorize a search, the Council noted:

On the other hand, the Commanding Officer with respect to property under his control has plenary power. He is fully and directly responsible to his Government for all action necessary to perform his duties. He has the power of investigation to determine whether a search should be made and to execute a search or direct its execution. In other words, he has the power of Federal agents, the magistrate and the process server.

It is the opinion of the Judicial Council that paragraph 138 of the Manual does not change the rule consistently applied in the military service as set forth in CM 248379, Wilson, 31 BR 235, 236, that a search of property owned or controlled by the United States made by or upon orders of the Commanding Officer having jurisdiction over the locality where the property is situated is not unreasonable and therefore not unlawful and that the evidence obtained thereby may be used in trials by courts-martial.

*Id.* at 442.

The Manual for Courts-Martial, United States, 1951, continued the prohibition against admission of illegally obtained evidence, *see* para. 152, and delineated lawful searches in these terms: [10]

A search conducted in accordance with the authority granted by a lawful search warrant.

---

8. *See United States v. Worley*, 3 CMR (AF) 424, 439 (1950). Winthrop does not deal with the legality of searches and seizures in his treatise. *See* Winthrop's *Military Law and Precedents* (1920 Reprint).

9. In CM 345745, *Sherwood*, 11 BR (Army) 249 (1951), the Army Judicial Council found it unnecessary to decide an objection upon Fourth Amendment grounds, "since military law itself prohibits unreasonable searches and seizures and renders evidence gained as a result thereof inadmissible." *Id.* at 251.

10. All the "examples, in the second subparagraph of paragraph 152, "with the exception of the military search example, may be found set forth in the table of search cases in *Harris v. United States*, 331 U.S. 145 [67 S.Ct. 1098, 91 L.Ed. 1399]." As to the example of a lawful military search, it was commented, "Military searches of this kind have been held lawful in *Grewe v. France* [D.C.] 75 F.Supp. 433, and in *Best v. United States*, [1st Cir.] 184 F.2d 131." *Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951*, page 241.

A search of an individual's person, of the clothing he is wearing, and of the property in his immediate possession or control, conducted as an incident of lawfully apprehending him.

A search under circumstances demanding immediate action to prevent the removal or disposal of property believed on reasonable grounds to be criminal goods.

A search made with the freely given consent of the owner in possession of the property searched.

A search of property which is owned or controlled by the United States and is under the control of an armed force, or of property which is located within a military installation or in a foreign country or in occupied territory and is owned, used, or occupied by persons subject to military law or to the law of war, which search has been authorized by a commanding officer (including an officer in charge) having jurisdiction over the place where the property is situated or, if the property is in a foreign country or in occupied territory, over personnel subject to military law or to the law of war in the place where the property is situated. The commanding officer may delegate the general authority to order searches to persons of his command. This example of authorized searches is not intended to preclude the legality of searches made by military personnel in the areas outlined above when made in accordance with military custom.

Although cognizant of the broad power traditionally enjoyed by commanding officers, the Court of Military Appeals soon enunciated the requirement that a commander have probable cause before authorizing a search. *United States v. Brown*, 10 U.S.C.M.A. 482, 28 C.M.R. 48 (1959).[11] Later the Court was even more explicit when it stated:

In Federal civilian practice, the issuance of a warrant to search, and other matters attendant thereto, are governed by Rule 41 of the Federal Rules of Criminal Procedure. Therein, certain specifically designated committing magistrates are granted authority to issue warrants. In military law, however, there is no provision for the issuance of a warrant to search. Power to authorize a search is within the province of the commanding officer, including an officer in charge. Paragraph 152, Manual for Courts-Martial, United States, 1951. In this context he stands in the same relation *vis-a-vis* the investigating officer and an accused as the Federal magistrate. And we have so equated him. *United States v. Ness*, 13 USCMA 18, 32 CMR 18; *United States v. Battista*, 14 USCMA 70, 33 CMR 282; *United States v. Davenport*, 14 USCMA 152, 33 CMR 364.

While he issues no warrants, the commanding officer is bound by the same rules in authorizing a search as his opposite number; that is, probable cause to believe that the things to be seized are on or within the premises to be searched. As we stated in *United States v. Ness*, supra:

"... a search based on a warrant is invalid if probable cause does not appear in the facts presented to the officer issuing the warrant. See *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *United States v. Brown*, 10 USCMA 482, 28 CMR 48." [*United States v. Ness*, supra, at page 22.]

It is a natural corollary, therefore, that the commanding officer must be informed to the same extent as his Federal counterpart prior to granting authority to search.

11. Earlier the Court had expressed "serious doubts" about being able to approve a search which was not expressly authorized, "without a showing of good cause." *United States v. Doyle*, 1 U.S.C.M.A. 545, 548, 4 C.M.R. 137, 140 (1952). In *Doyle* the Court found such cause. In 1954 the Court approved a search which was based on "probable cause"; and, citing *Doyle*, it referred to "the existence of probable cause" as "a circumstance which was given substantial weight by us in another problem of search and seizure." *United States v. DeLeo*, 5 U.S.C.M.A. 148, 160, 17 C.M.R. 148, 160 (1954).

*United States v. Hartsook, supra* at 294, 35 C.M.R. at 266. However, while the Court in *Hartsook* equated a commander to the "independent judicial officer" who issues a warrant, *id.*, it did not require that the warrant be in writing or that the commander's determination of probable cause be "supported by Oath or affirmation." [12]

The Manual for Courts-Martial, United States, 1969 (Revised edition), relying on intervening precedent, expanded its discussion of illegally obtained evidence beyond that of its 1951 predecessor. Thus, it declares lawful "[a] search incident to a lawful hot pursuit of a person." Para. 152, Manual, *supra. Cf. Warden v. Hayden, supra.*

The 1969 Manual also denominates as lawful: [13]

A search of any of the following three kinds which has been authorized upon probable cause by a commanding officer, including an officer in charge, having control over the place where the property or person searched is situated or found or, if that place is not under military control, having control over persons subject to military law or the law of war in that place:

(1) A search of property owned, used, or occupied by, or in the possession of, a person subject to military law or the law of war, the property being situated in a military installation, encampment, or vessel or some other place under military control or situated in occupied territory or a foreign country.

(2) A search of the person of anyone subject to military law or the law of war who is found in any such place, territory, or country.

(3) A search of military property of the United States, or of property of nonappropriated fund activities of an armed force of the United States.

Thereafter, it defines "probable cause" in these terms:

Probable cause for ordering a search exists when there is reason to believe that items of the kind indicated above as being properly the subject of a search are located in the place or on the person to be searched. Such a reasonable belief may be based on information which the authority requesting permission to search has received from another if the authority ordering the search has been apprised of some of the underlying circumstances from which the informant concluded that the items in question were where he claimed they were and some of the underlying circumstances from which the authority requesting permission to search concluded that the informant, whose identity need not be disclosed, was credible or his information reliable.

In applying these provisions of the current Manual, this Court has equated the military commander with the Federal magistrate in ruling that a commander must be "neutral and impartial" if he is to authorize a search and, accordingly, that a search is unlawful if authorized by a commander whose neutrality has been fatally compromised by active involvement in an investigation. *See, e. g., United States v. Rivera,* 10 M.J. 55 (C.M.A.1980). That the equation of commander and magistrate has become ever more difficult to maintain is illustrated by *United States v. Ezell, supra,* where we ruled that a commander is not *per se* disqualified to authorize a search, but cautioned that henceforth a commander who takes part in the search itself will be pre-

12. *Instead, the Court observed (15 U.S.C.M.A. 291, 294, 35 C.M.R. 263, 266):*

But where, as in the military, authorization generally is granted on a mere verbal presentation, the issue must necessarily be determined through the taking of extensive testimony. This is often a difficult .method of procedure for in most cases trial is held some period of time later and all concerned must rely on their memories to recall just what information was supplied and received. On occasion, the data and testimony available is not sufficient for a proper determination and on appeal we have had to return the case for a rehearing on this issue. *United States v. Davenport,* supra.

13. Para. 152, Manual for Courts-Martial, United States, 1969 (Revised edition).

sumed to have evidenced his lack of neutrality—and thereby jeopardized the legality of the search.

Now, in urging us to rule that a commanding officer cannot validly authorize a search unless he has found probable cause on the basis of sworn testimony, appellate defense counsel contend that such a result necessarily follows from the Fourth Amendment's requirement that a "warrant" be predicated on sworn evidence. Under this rationale it would also seem necessary that a commander's authorization to search be incorporated in a written document that satisfies the requirements for particularity applied to warrants by the Fourth Amendment.

▄▄▄ The possible existence of a faulty premise in this regard is suggested by Chief Judge Fletcher's cogent observation in *Ezell* :

> I believe it unnecessary as well as increasingly in contradiction of common sense to equate the military commander in his duty to produce an effective fighting force and his concomitant responsibility as the chief law enforcement official on a military installation to a neutral and detached magistrate within the meaning of judge or magistrate in the civilian society. Such a legal fiction is counterproductive in assessing the realities of everyday military life and provides no viable standard for a determination of reasonableness under the Fourth Amendment.

*Id.* at 328. A military commander has responsibilities for investigation and for law enforcement that a magistrate does not possess. Also, he has responsibilities for the welfare and combat readiness of the personnel under his command. *See United States v. Middleton, supra.* The commander's responsibilities with respect to an installation or area over which he has command give him the power to deny entry to persons who do not submit to a search at the gateway. *See· United States v. Rivera*, 4 M.J. 215 (C.M.A. 1978).[14] Similarly, these responsibilities provide the commander with a basis for curtailing the exercise of First Amendment rights within the area under his command. *Brown v. Glines*, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980); *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976). Paragraph 152 of the Manual for Courts-Martial, in which the President empowered commanders to authorize searches and seizures as to persons and property under his command, was not promulgated because the commander could by legalistic legerdemain be transmuted into a magistrate [15]; but instead this was done because, in light of the responsibilities imposed upon the commander, it was reasonable to give him this power.

In promulgating paragraph 152 of the Manual the President may also have recognized that inherent in the command structure are some safeguards against a commander's indiscriminate invasion of the privacy of his subordinates. For one thing, combat readiness of troops depends in large part upon their motivation, but discipline and punishment cannot alone develop the necessary motivation. Leadership is also required, and one aspect of successful leadership is concern for the welfare of subordinates. Loyalty in a military unit, as in other organizations, is a two-way street. A commander who approves—or even tolerates—arbitrary invasions of the privacy of his subordinates is not demonstrating the brand of leadership likely to command the

---

**14.** Of course, *Rivera* involved an installation overseas, so that the analogy to "border searches" was available.

**15.** Equating the commander with the magistrate presents a very practical problem of what to do about specific information possessed by the commander which is relevant to a determination of probable cause. Although a magistrate is expected to use his common sense in determining whether probable cause exists, it is usually contemplated that his decision will be based on information supplied to him by others—and supplied under oath. Contrariwise, the military commander has never been viewed as precluded from utilizing any prior information, however extensive and regardless of its origin, which might be relevant in determining probable cause. *See United States v. Ezell*, 6 M.J. 307, 331 (C.M.A.1979) (Cook, J., concurring and dissenting).

loyalty or produce the high morale associated with a combat-ready organization. Accordingly, a commander has some incentive to act reasonably and with sound judgment in acting on requests for searches and seizures which involve his personnel. Moreover, repeated failures by a commander to respect the Fourth Amendment rights of his troops might become a basis for a "complaint of wrongs" under Article 138 of the Uniform Code, 10 U.S.C. § 938, or, in the extreme case, even for a prosecution for dereliction of duties as a commander. *See* Article 92, UCMJ, 10 U.S.C. § 892.

In discussing lawful searches, the 1951 Manual refers to searches "made in accordance with military custom." Para. 152.[16] Winthrop describes "custom" as "a uniform, known practice of long standing, which is also certain and reasonable." Winthrop, *Military Law and Precedents* (1920 Reprint), 42. "Military custom," so defined, has long granted military commanders broad powers of search and seizure. *See United States v. Middleton, supra.* The existence of that custom clearly imposes some limitation on a serviceperson's reasonable expectation of privacy. In our view servicepersons have never expected that, before authorizing a search, a military commander would comply with the warrant procedure required of a federal magistrate. Indeed, except to a literalistic and loyal reader of this Court's opinions, equating a military commander with a judicial officer would probably have seemed odd. Instead, the commander's long-recognized power to authorize searches within the area of his command is generally viewed as derived from and correlative with his position and responsibilities in the military community—which, of course, is "a specialized society separate from civilian society." *Parker v. Levy*, 417 U.S. 733, 743, 94 S.Ct. 2547, 2556, 41 L.Ed.2d 439 (1974). Accordingly, a commander's authorization of a search has never been equated with the judicial-type procedure which comes within the contemplation of the warrant clause of the Fourth Amendment.

Indeed, if—contrary to the custom and expectations of servicepersons—a commander is to be treated as a parttime magistrate who assumes that identity when requested to permit a search and then immediately reverts to his underlying role as commander, why limit him to authorizing searches involving persons and property under his own command? Why not allow him to authorize searches of persons and property under some other officer's command? This Court has required that the commander be neutral and impartial in performing his duties as a magistrate. Presumably the commander of Company A could be even more neutral and detached in evaluating a request to conduct a search in Company B than in ruling on a request for permission to search within the area of his own Company. Yet, any such procedure, if ever suggested, has not been seriously considered, because granting a commander the right to authorize searches outside his own area of responsibility would be inconsistent with the rationale for a military commander's power to authorize searches—namely, his responsibility for the persons and property under his command. Furthermore, the reasonable expectations of service members would be violated by allowing their privacy to be disturbed at the direction of someone who is not a magistrate and who, as to them, has no command-type responsibilities.

As we construe the term "warrant" in the Fourth Amendment, it contemplates some type of written order. However, not every order to which the term "warrant" is sometimes applied was within the contemplation of the drafters of the Fourth Amendment. Thus, the "administrative warrant" under which Colonel Abel was arrested was not subject to the warrant requirements of the Fourth Amendment. *United States v. Abel, supra; see United States v. Watson, supra* at 417, 96 S.Ct. at

---

**16.** The Supreme Court in *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), recognized that "the military has developed what 'may not unfitly be called the customary military law' or 'general usage of the military service.' *Martin v. Mott*, 12 Wheat 19, 35, 6 L.Ed. 537 (1827)." *Id.* at 744, 94 S.Ct. at 2556.

824. Although in *United States v. Hart-sook, supra*, the Court equated a military commander with a Federal magistrate, the identification was not complete, for in the next sentence it was observed that, even so, the commander "issues no warrants." *See id.* at 294, 15 C.M.R. at 266. Implicit in this observation is a recognition that for purposes of the Fourth Amendment a warrant is an order for search, seizure, or arrest issued by someone who is "a neutral and detached magistrate within the meaning of judge or magistrate in the civilian society." *United States v. Ezell, supra* at 328 (Fletcher, C. J., concurring).[17] While the Supreme Court has not fully defined the term "magistrate," *see Shadwick v. City of Tampa*, 407 U.S. 345, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972), it seems perfectly clear that a military commander—no matter how neutral and impartial he strives to be—cannot pass muster constitutionally as a "magistrate" in the strict sense. Therefore, even if he gives written authorization for a search and seizure and labels the document a "warrant," and even if this Court uses the same label, the document still is not a "warrant" within the contemplation of the Fourth Amendment, for the commander is not a true "magistrate." *Cf. Shadwick v. City of Tampa, supra.*

From this conclusion several corollaries follow. First, we reject the argument of appellate defense counsel that a commander must base probable cause on sworn evidence because the Fourth Amendment requires that probable cause for a warrant be "supported by Oath or affirmation." The warrant clause of the Fourth Amendment has nothing to do with the question, since the commander is not issuing a "warrant" within the contemplation of that clause. Any requirement of an oath must rest on other grounds.

Second, the military commander cannot derive any power to authorize searches and seizures by use of the legal fiction that he is a "magistrate" who can issue warrants. The commander's power to authorize searches of places and persons under his control exists—to whatever extent it does exist—because it complies with the Fourth Amendment's basic norm of reasonableness. In short, it is reasonable for him to have this power in light of his responsibilities and the expectations of the persons who will be affected by the searches and seizures.[18]

In defining a commander's right to authorize searches, the President could have required that there be "exigent circumstances" which make it impracticable for law enforcement agents to obtain a warrant from a magistrate. However, in exercising his powers—whether derived from his constitutional authority as commander-in-chief under Article II or from his delegated authority under Article 36 of the UCMJ, 10 U.S.C. § 836, *see United States v. Ezell, supra* at 317—the President chose not to limit in this manner the long-recognized authority of a commander to authorize searches. His choice in this regard is no more vulnerable to attack than Congress' refusal to restrict the authority of Federal agents to arrest without warrant by requiring that "exigent circumstances" exist which make it impracticable to obtain an arrest warrant. *See United States v. Watson, supra.*[19]

### III

Our ruling that a commander's power to authorize searches is independent of the Warrant Clause of the Fourth Amendment does not compel the conclusion that, because of his command responsibilities and

---

17. *See* Fed.R.Crim.P. 54 for a definition of "magistrate."

18. Under truly "exigent circumstances" the commander, like anyone else having law enforcement responsibilities, can perform or authorize a search which does not rely for its legitimacy on his control over the place or person affected.

19. Just as a commander's power to authorize searches has deep roots in military custom, the authority of peace officers to arrest without a warrant has a common law vintage. There is—and should be—judicial reluctance to invalidate procedures supported by long established custom and extensive experience.

his control over the persons and places under his command, a commander may authorize searches and seizures at his whim. For the most part the searches and seizures which have been upheld as reasonable despite absence of a warrant have been predicated on probable cause. *Cf. Brinegar v. United States, supra; Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). Thus, this Court need not forsake our ruling, later incorporated in paragraph 152 of the current Manual for Courts-Martial,[20] that a commander's authorization to search must be based on probable cause. *United States v. Hartsook, supra.* Likewise, we need not retreat from our precedents that require the commander to make a neutral and impartial determination of probable cause and that suggest what actions will disqualify him from making such a determination. *United States v. Rivera, supra; United States v. Ezell, supra.* Impartiality and objectivity are hallmarks of rational action; demanding them of the commander conforms to the Fourth Amendment's basic requirement of reasonableness.

Is it indispensable, however, to the reasonableness of a search authorized by a military commander that he base probable cause on sworn evidence? In attacking the omission of an oath, appellate defense counsel emphasize that, even though Article 107

of the Uniform Code, 10 U.S.C. § 907, may deter the making of false statements to a commander engaged in ascertaining if probable cause exists,[21] the administration of an oath provides an important safeguard, since it reminds the oath-taker that he is engaged in a serious matter and so should speak with caution. This claim is undeniable; otherwise, there would have been little occasion for the drafters of the Fourth Amendment to specify that warrants be issued only upon "Oath or affirmation" or for the Congress to require the administration of oaths in connection with the undertaking of many important responsibilities.[22]

Appellate defense counsel also suggest that to provide the safeguard of sworn information imposes only a trivial burden on the Armed Services. A simple oath will suffice[23] and the information can be furnished orally instead of in affidavit form. *See* Fed.R.Crim.P. 41(c)(2). Furthermore, under Article 136 of the Uniform Code, 10 U.S.C. § 936, the authority to administer oaths can be granted by regulations of the armed forces to those persons for whom it is necessary in the performance of their duties; thus, by Service regulations commanders can readily be granted the authority to administer oaths when they are engaged in determining if probable cause exists for a search.[24]

**20.** *See* discussion in *Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951,* para. 152.

**21.** Of course, Article 107 requires an "intent to deceive" and does not proscribe reckless and careless statements. Further, Article 107 would not apply to misstatements by a person who is not in the armed forces.

**22.** Article 136, Uniform Code of Military Justice, 10 U.S.C. § 936, implicitly recognizes that oaths may be necessary for purposes of military administration, including military justice. The penalties for perjury authorized under Article 131, UCMJ, 10 U.S.C. § 931, attest to the importance attached to testimony given under oath. Likewise, false swearing is punishable under Article 134, UCMJ, 10 U.S.C. § 934. Court-martial charges are signed under oath, para. 29e, 1969 Manual, *supra*, and oaths are an important feature of trials by courts-martial, paras. 112–13, 1969 Manual, *supra*. Depositions are taken under oath. *Cf.* Article 49(c),

UCMJ, 10 U.S.C. § 849. Furthermore, the taking of an oath accompanies any enlistment into the Armed Services. 10 U.S.C. § 502.

**23.** After *Fimmano* the Army suggested, in a Change to AR 27–10, that this language be used:

> You swear (or affirm) that the information you are providing is to the best of your knowledge, information and belief, the truth, the whole truth and nothing but the truth (so help you GOD).

**24.** We are informed that on January 25, 1980— four days after the *Fimmano* opinions were handed down—the office of the The Judge Advocate General of the Army sent a worldwide message announcing a new change to Army Regulation 27–10, so that individuals who authorized searches could administer oaths to those people whose information provided the probable cause.

We cannot deny that determinations of probable cause supported by sworn testimony are desirable.[25] Likewise, optimally, the commander's authorization for a search would be embodied in a document "particularly describing the place to be searched, and the persons or things to be seized."[26] Our present task, however, is not to delineate the best procedure but, instead, to determine which procedures meet minimal constitutional requirements of reasonableness for authorization of searches and seizures within the military community.

When a civilian magistrate is requested to issue a search warrant or arrest warrant, he normally will have no prior information about the facts on which a determination of probable cause may be based. Frequently—probably typically—the affidavit of a law enforcement agent will be the vehicle for bringing to his attention the relevant information—which may include hearsay and other evidence that would not be admissible at a trial. *Cf. United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); *Jones v. United States, supra.* Also, such an agent may communicate the information to "a Federal magistrate . . . by telephone or other appropriate means" where "the circumstances make it reasonable to dispense with a written affidavit." Fed.R.Crim.P. 41(c)(2)(A).[27]

Unlike a civilian magistrate, the military commander who is requested to authorize a search often will already have acquired information that is relevant to a determination of probable cause. He may have seen police reports concerning a suspect or know of his reputation, prior convictions, or nonjudicial punishments. Some of the commander's information may be of a hearsay nature and not admissible in court, but nevertheless of sufficient reliability so that, if properly presented in an affidavit, it would help support a search warrant. *Cf. Jones v. United States, supra; Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956); *Brinegar v. United States, supra.* Some of the evidence already in the commander's possession may consist of documents which are not prepared under oath but which—under hearsay exceptions for official records or business entries—would be admissible at a trial to establish guilt or innocence.

Judge Cook has written that in military justice "a commander may consider information previously known to him in determining whether probable cause exists to justify a search." *United States v. Ezell, supra* at 331 (Cook, J., concurring and dissenting). If this observation is correct, how can it be reconciled with the requirement that probable cause be based only on sworn testimony? If, on the other hand, the statement is inaccurate, what is the means, if any, by which relevant information already known to the commander who has been requested to issue a search warrant may be considered in making his probable cause decision? Must the commander who possesses this information, in turn, refer the request for search authority to a higher echelon and then submit to the superior commander his own sworn recitation of the information which he possesses? Further, if official records or business records contain information relevant to a probable cause decision, will it be necessary that someone swear before the commander that the documents say what they purport to say, rather than merely submitting the records to the commander for his consideration?

**25.** As has been noted in the text, Circular 6 of the Eighth Army provided in 1948 for issuance of search warrants "upon reasonable cause, stated upon affirmation or oath."

**26.** *See* U.S. Const. Amend. IV. Under such circumstances appellate review is much easier to accomplish; but, "where, as in the military, authorization generally is granted on a mere verbal presentation, the issue must necessarily be determined through the taking of extensive testimony." *United States v. Penman*, 16 U.S. C.M.A. 67, 69, 36 C.M.R. 223, 225 (1966); *United States v. Hartsook*, 15 U.S.C.M.A. 291, 294, 35 C.M.R. 263, 266 (1965).

**27.** In that event, he directs "the person requesting the warrant to sign the Federal magistrate's name on the duplicate original warrant." Also, by voice recording device, stenographically, or in longhand, he records the oral testimony that has been furnished him. Fed.R.Crim.P. 41(c)(2)(C), (D).

If this Court enunciates a requirement that probable cause be based solely on sworn testimony, failure to satisfy that requirement will render a search or seizure unlawful and will make inadmissible any evidentiary fruit of that search. These consequences will be the same wherever American armed forces are stationed. However, the conditions in which those forces operate will vary dramatically from place to place and between large organizations and small detachments. For example, sometimes the military units will be in foreign countries where information relevant to a determination of probable cause may be available chiefly from local nationals who are unfamiliar with oaths and so are reluctant to speak under oath. Furthermore, while the administration of an oath is often not difficult—especially if the language of the oath appears on a card or other document available for use by the person giving the oath—military commanders will in many instances be less familiar with the form and administration of oaths than are either military investigators or civilian magistrates. Of course, if use of the oath is essential for a lawful search, vigorous defense counsel, in the proper performance of their duties, will be seeking at a subsequent time to establish that oaths were not given or were administered incorrectly for, by so doing, they will be able to exclude damaging evidence.

Information can be provided in sworn form without being placed in affidavit form. Two of the Judges made this point in *Fimmano* and suggested Fed.R.Crim.P. 41(c)(2)(D) as a model for obtaining oral testimony under oath. However, if one examines the requirement under Rule 41(c)(2)(D) that a magistrate record the oral testimony given under oath when it is being received, then it seems clear that compliance by a military commander at some far-flung installation with such a procedure may be more onerous than for a Federal magistrate, whose primary responsibility is judicial and who, in many instances, will be a trained lawyer.

When we consider the variety of circumstances under which a commander may be requested to authorize a search—and despite our great respect for the role of the oath in enhancing trustworthiness—we are unwilling to rule that a determination of probable cause is invalid—and a search based thereon is unlawful—solely because the commander who authorized the search relied on unsworn testimony. The oath requirement can be readily compiled with in the issuance of a "warrant" by a "magistrate" or "judicial officer"—the situation which the drafters of the Fourth Amendment contemplated. However, to require inflexibly that a military commander base probable cause for searches and seizures only on sworn testimony may present formidable administrative difficulties and lead to many suppression hearings hinging solely on whether a commander administered an oath to a witness in the proper form. The gain in reliability from administration of the oath is simply not great enough to dictate the conclusion that it is unreasonable *per se* for a commander to find probable cause from unsworn information.[28]

## IV

Although we reject an inflexible requirement that a military commander not authorize a search and seizure unless he has established probable cause by sworn testimony, this is not the end of the matter. We have emphasized that sworn testimony typically is more credible and entitled to greater weight than information not given under oath. As suggested earlier in this opinion, administration of an oath is not a difficult task; indeed, our examination of numerous records of trial reveals that this is a standard practice of many military investigators, who routinely obtain sworn statements from witnesses and suspects. A military commander who fails to obtain evidence under oath when it is feasible for him to do so has neglected a simple means for

---

**28.** Ironically, warrants not infrequently are issued by Federal magistrates when based on an affidavit by a law enforcement agent about a report from someone who is unidentified, unsworn and not subject to cross-examination.

enhancing the reliability of his probable cause determination. In a marginal case this lack of concern for obtaining the most reliable evidence available may prove fatal when the commander's finding of probable cause is being attacked before a court-martial.

Just as a commander's use of sworn evidence helps sustain his determination of probable cause, his care as to other related matters makes his finding of probable cause more readily supportable. A commander who—before or at the time of authorizing a search—reduces to writing the information on which he has based his finding of probable cause has supported that finding with an indicia of his reasonableness. Similarly, a commander's issuance of a written authorization for a search cloaks the ensuing search with a more ample mantle of reasonableness than would be provided by mere verbal approval of the search.

V

The drafters of paragraph 152 of the current Manual for Courts-Martial contemplated "that in areas of high concentration of military personnel it may become desirable to establish a military magistrate for several commands." *Analysis of Contents, Manual for Courts-Martial, United States, 1969, Revised edition*, para. 152. In recent years one Service has, in fact, instituted new procedures whereunder military magistrates and judges—who qualify as "magistrates" or "judicial officers" within the contemplation of the Fourth Amendment, *Shadwick v. City of Tampa, supra*—are empowered to authorize searches and seizures.[29] In response to requests for search authority—typically, written requests supported by affidavits—they issue written search authorizations wherein the places to be searched and the items to be seized are particularized. The development of such procedures as a safeguard for the privacy rights of service personnel is, of course, to be highly commended.

In the civilian sector the preference for warrants is manifested by the Supreme Court's willingness to defer to the judgment of a magistrate in "doubtful or marginal cases." *United States v. Ventresca, supra* at 109, 85 S.Ct. at 746. Thus, there is something of a precedent for finding a determination of probable cause by a military commander deficient while, on the same evidence, a determination of probable cause by a military magistrate could be upheld. *Accord, Jones v. United States, supra; cf.* 3 LaFave, *Search and Seizure* § 11.2(b) n.20. In his concurrence in *Ezell*, Chief Judge Fletcher would apparently go even further by stating that in subsequent cases he would "take into consideration the failure of the commander to refer his decision to search for review and action to a military judge or magistrate" where one was available. 6 M.J. at 330. Even though we have not ruled that it is unreasonable *per se* for a military commander to authorize a search when permission to search could readily have been sought from a military magistrate, the likelihood that a search and seizure will withstand subsequent attack in court is—and should be—greater when a judicial officer trained in the law has made the determination of probable cause than when a commander does so. Thus, a military law enforcement agent or a commander should have a significant incentive to refer a request for search authority to a military magistrate if this is feasible.

VI

The decision of the United States Army Court of Military Review is affirmed.

FLETCHER, Judge (concurring in the result):

I vote to affirm the decision of the Army Court of Military Review on the reasoning expressed in *United States v. Ezell*, 6 M.J. 307 (C.M.A.1979), and because the search herein occurred in 1974, prior to this Court's

29. *See e. g.*, AR 27–10 (July 19, 1972), and USAREUR Supplement 1 to AR 190-22 (July

11, 1978). *See also* Moyer, *supra*.

opinion in *United States v. Fimmano*, 8 M.J. 197 (C.M.A.1980).

COOK, Judge (concurring in part and dissenting in part):

The principal opinion reaffirms the Court's decision in *United States v. Ezell*, 6 M.J. 307 (C.M.A.1979), that a commander is not inherently disqualified to authorize a search predicated upon probable cause. I agree with the reaffirmation. The principal opinion also purports to reaffirm the long-standing rule that a commander's authorization to search is not constitutionally invalid because based upon information not given under oath or affirmation, but the reaffirmation is so qualified as to emasculate the commander's authority. I agree with the determination that an application to a commander for an authorization to search need not be made on oath or affirmation, but I unqualifiedly reject the limitations the opinion engrafts· upon the rule.

The principal opinion says first that the commander's decision as to the existence of probable cause is not entitled to the same deference that, under *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), would be accorded the judgment of a magistrate in the civilian community when that judgment is challenged by an accused. The net effect is that the commander is treated as though he were a policeman or prosecutor. *Ezell* held that, inherently, a commander is a "neutral" person sufficiently "detached" from police and prosecutive functions to be qualified, constitutionally, to authorize a search. I cannot see how the exercise of this authority on the basis of unsworn information diminishes the commander's qualification and status as a magistrate, when the oath or affirmation is not constitutionally required for issuance of his authorization to search.

The second consequence of the absence of an oath, says the principal opinion, is that "the reliability of . . . [the commander's] probable cause determination" becomes suspect; it becomes so suspect that his failure "to obtain" an "oath when it is feasible for him to do so" can be "fatal" to his authorization. I do not perceive the logic of the qualification. If an authorization on information not under oath or affirmation is valid in the first instance, how can the authorizing official's failure to obtain an oath render his authorization invalid? The qualification does not pertain to an exceptional situation, but to the common-place application for authority to search; substantively, it requires an oath in all but emergency situations. As I see it, the qualification devours the rule which the principal opinion professes to reaffirm. I, therefore, reject the qualification.

Finally, the principal opinion seems to reaffirm the established rule that an authorization to search need not be in writing. Here, too, the opinion cloaks the rule in an exception that is so broad as to reduce the probability of judicial approval of an oral authorization to near zero. Such a rule insures, if it does not command, that a writing be used. As I read this part of the principal opinion, it does not reaffirm the established rule, but posits a new and unacceptable one. I also dissent from that part of the opinion.