# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

———————————

**No. 201700077**

———————————

**UNITED STATES OF AMERICA**
Appellee

v.

**CALVIN E. PERKINS, JR.**
Sergeant (E-5), U.S. Marine Corps
Appellant

———————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges: Col J.K. Carberry, USMC; Major M.D. Zimmerman, USMC.
Convening Authority: Commanding Officer, Marine Corps Air Station Yuma, Yuma, AZ.
Staff Judge Advocate's Recommendation: Lieutenant Colonel Jennifer S. Parker, USMC.
For Appellant: Lieutenant Commander William L. Geraty, JAGC, USN.
For Appellee: Lieutenant Kurt W. Siegal, JAGC, USN; Captain Sean M. Monks, USMC.

———————————

Decided 12 July 2018

———————————

Before HUTCHISON, FULTON, AND SAYEGH, *Appellate Military Judges*

———————————

**PUBLISHED OPINION OF THE COURT**

———————————

FULTON, Senior Judge:

A panel of officer and enlisted members, sitting as a general court-martial, convicted the appellant, contrary to his pleas, of one specification of conspiracy to commit larceny and one specification of violating a lawful general order in violation of Articles 81 and 92, Uniform Code of Military

Rereleased on 13 July 2018 as a Published Opinion

Justice (UCMJ).[1] The convening authority approved the adjudged sentence of reduction to paygrade E-1 and a bad-conduct discharge. The appellant assigns three errors:

(1) the military judge should have suppressed evidence discovered during a search of the appellant's house because the search authorization was not supported by probable cause;

(2) the military judge erred by taking judicial notice that an order requiring the appellant to register his personal firearms was a lawful general order; and

(3) the appellant's conviction for violating a lawful general order is legally and factually insufficient because the government failed to prove that the relevant order was a lawful general order.

We conclude that the findings and sentence are correct in law and fact and that no error materially prejudiced the substantial rights of the appellant.[2]

## I. BACKGROUND

The appellant was an active duty Marine stationed on board Marine Corps Air Station Yuma, Arizona. MI, a woman with whom the appellant had been romantically involved, complained to Naval Criminal Investigative Service (NCIS) Special Agent JJ that the appellant had committed extortion by threatening to make public nude pictures and videos that the appellant had taken of her without her consent. During the investigation that followed, NCIS agents searched the appellant's on-base residence for digital media and found what they believed to be stolen military property. Before trial, the appellant moved to suppress military property NCIS discovered while searching the appellant's home. The appellant contended that the search authorization was not supported by probable cause. The military judge denied the motion, and the appellant argues that the military judge erred.

During a brief hearing on the motion to suppress, the government presented the telephonic testimony of Special Agent JJ and an affidavit from the base commanding officer (CO) who had verbally issued the search authorization. Special Agent JJ testified to the information she received from MI, whom Special Agent JJ had interviewed at a victim advocate center. Questioning by the military judge revealed that the interview had been recorded, but the record does not indicate that the CO heard the recording before authorizing the search. MI's account was not under oath.

---

[1] 10 U.S.C. §§ 881 and 892.

[2] Arts. 59(a) and 66(c), UCMJ.

MI told Special Agent JJ that the appellant had threatened to release nude pictures and videos of her unless she agreed to purchase items for him. MI denied ever seeing any such pictures or video and did not specifically claim to have seen the appellant take any. But she did recall the appellant "using his cell phone while they [were] having sexual relations."[3] MI did not say where she thought the recordings might have happened, nor did she suggest that the appellant kept any cameras in his home that could have been used to make these recordings.

According to Special Agent JJ, MI said that the appellant "possibly was storing electronic media containing all these videos and footage of them having sex,"[4] and she "did [al]lude to the potential of him using other devices . . . in his house, electronic devices capable of storing such media."[5] MI also said that the appellant "may have extorted other individuals, that he might possess unregistered firearms, and was possibly storing illegally obtained items in his storage unit that he had off base."[6]

Besides speaking to NCIS, MI told the sergeant major of the appellant's squadron that the appellant had been stalking her, and that she was in fear for her life for having made the report to NCIS. At MI's request, the appellant's squadron drafted a military protective order and contacted the appellant, who was out of state on leave, and directed that he return to base that night to acknowledge receipt of the order. MI did not speak to the base CO.

Since the appellant's squadron had directed the appellant to come back to Yuma that night, Special Agent JJ decided to ask the base CO for "a command authorized search and seizure under exigent circum[stances] because of the possibility of him destroying evidence."[7] Before approaching the base CO, Special Agent JJ consulted with trial counsel and the base staff judge advocate, who agreed that a command authorized search of the appellant's home "under exigent circumstances" was appropriate.[8] Then she called the base CO. She told him "all [the] known facts at the time[.]"[9] When the CO responded by asking Special Agent JJ to "explain all the facts in

---

[3] Record at 14.

[4] *Id.* at 11.

[5] *Id.* at 14.

[6] *Id.* at 11.

[7] *Id.* at 12.

[8] Appellate Exhibit (AE) III at 5; *see also* Record at 14.

[9] Record at 14.

detail," she told him that she had consulted the staff judge advocate and the trial counsel, and "explained the residence, where it was located, the impact it could have on the community on Marine Corps Air Station Yuma."[10]

Special Agent JJ testified that, based on this information, the CO "agreed to issue a verbal command authorized search and seizure under exigent circumstances . . . ."[11] The authorization covered the entire residence. Because Special Agent JJ thought that the evidence she sought could have been stored on a cell phone's memory, or "SD" card, and that the SD card might have been removed from the cell phone, she understood the authorization to extend to "anything that was small enough to contain . . . a very, very small media storage device . . . it can be something as small as a nail."[12]

At the hearing on the motion, the government also provided an affidavit signed by the base CO explaining his probable cause determination. The relevant portion of the affidavit is short:

> [JJ] informed me that a female civilian, [MI], reported earlier that day that Sgt Perkins was extorting her by threatening to reveal personal nude videos and photographs if she did not purchase him goods. Agent [JJ] informed me that the videos and pictures were likely contained inside of Sgt Perkins' home, and due to an earlier conversation with [the appellant's sergeant major], she believed Sgt Perkins was returning to the home that very evening. I determined that there was probable cause for a search . . . .[13]

The government presented no other evidence supporting the CO's probable cause determination.

The search of the appellant's home did not reveal any nude photos or videos of MI. It did, however, result in NCIS's discovery of government property in the appellant's garage. NCIS obtained a second search authorization allowing agents to seize this property as evidence. This evidence led to the appellant's conviction for conspiracy.

Ruling from the bench, the military judge denied the motion to suppress. The military judge found that the CO's probable cause determination was based on the information he received from Special Agent JJ. The military

---

[10] *Id.*

[11] *Id.*

[12] *Id.* at 16.

[13] AE IV at 7.

judge found that this information constituted probable cause to believe that agents would find digital media in the appellant's home containing evidence of the extortion.

We address the facts relevant to the other two assignments of error in the discussion section.

## II. DISCUSSION

The appellant contends that the military judge abused his discretion by finding that the CO had probable cause to authorize the search of his home. Although we agree that the CO lacked probable cause, we find that the resulting evidence was admissible under the good faith exception to the exclusionary rule.

## A. Probable cause to authorize search

### 1. Applicable law

We review a military judge's denial of a motion to suppress for an abuse of discretion.[14] We reverse for an abuse of discretion if the military judge's findings of fact are clearly erroneous or if his or her decision is influenced by an erroneous view of the law.[15] We consider the evidence in the light most favorable to the prevailing party, in this case the government.[16]

Courts are not to conduct a *de novo* review of a commander's probable cause determination. Rather, we give great deference to that determination and examine whether a commander had a substantial basis for concluding that probable cause existed.[17] A substantial basis exists "when, based on the totality of the circumstances, a common-sense judgment would lead to the conclusion that there is a fair probability that evidence of a crime will be found at the identified location."[18] Although we consider the evidence in the light most favorable to the prevailing party,[19] deference to the commander's determination is not boundless, and we may conclude that the commander's probable cause determination "reflected an improper analysis of the totality of the circumstances[.]"[20] Although a person authorizing a search may rely in

---

[14] *United States v. Hoffmann*, 75 M.J. 120, 124 (C.A.A.F. 2016).

[15] *United States v. Owens*, 51 M.J. 204, 209 (C.A.A.F. 1999).

[16] *United States v. Macomber*, 67 M.J. 214, 219 (C.A.A.F. 2009).

[17] *United States v. Rogers*, 67 M.J. 162, 164-65 (C.A.A.F. 2009).

[18] *Id.* at 165 (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

[19] *United States v. Carter*, 54 M.J. 414, 418 (C.A.A.F. 2001) (citing *United States v. Reister*, 44 M.J. 409, 413 (C.A.A.F. 1996)).

[20] *United States v. Leon*, 468 U.S. 897, 915 (1984) (citation omitted).

part on the expertise and experience of a law enforcement officer, "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others."[21]

The Military Rules of Evidence provide that when a seizure is made pursuant to a search authorization, the search authorization must be based upon probable cause.[22] Probable cause "is a fluid concept—turning on the assessment of probabilities in particular factual contexts[.]"[23] A commander considering a request for a search authorization must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."[24] Probable cause requires not just that the sources of information be sufficiently reliable, but also a sufficient nexus between the alleged crime and the specific place to be searched or item to be seized.[25]

Reviewing courts may read the matters supporting the probable cause determination to include inferences the issuing officer reasonably could have made and consider whether that officer might have made these inferences in reaching a probable cause determination.[26]

### 2. Analysis of probable cause determination

We are working with a limited factual record. As this was a telephonic request for a search authorization, Special Agent JJ did not create an affidavit in support of her request to the CO. Special Agent JJ's testimony in support of the government's opposition to the motion is vague. And the CO's affidavit, prepared for the purpose of supporting his probable cause determination at the motion hearing, contains little more than a recital of the allegation against the appellant and the fact that Special Agent JJ told him that she thought it likely that NCIS would find the nude pictures and videos

---

[21] *Id.* (citations and internal quotation marks omitted).

[22] *See* MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 315(f)(1); SUPPLEMENT TO MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.) (MCM).

[23] *Gates*, 462 U.S. at 232.

[24] *Id.* at 238; *see also Ornelas v. United States*, 517 U.S. 690, 696 (1996) (probable cause to search "exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found" in a particular place (citation omitted)).

[25] *See United States v. Nieto*, 76 M.J. 101, 106 (C.A.A.F. 2017).

[26] *See United States v. Eppes*, 77 M.J. 339, 345 (C.A.A.F. 2018).

of MI in the appellant's home. After considering the evidence of record and granting the CO's determination the deference it is due, we find that the government did not carry its burden on the motion of demonstrating that the base CO had a substantial basis for issuing the search authorization.

First, the record does not include any evidence addressing MI's veracity or provide any reason for the CO to have found MI's account credible. MI's account to Special Agent JJ was, so far as we can tell, unsupported by any corroborating evidence.

Even if we were to take MI's account at face value and allow for every reasonable inference the CO could have drawn, MI's account did not provide probable cause to search the appellant's home. No one explicitly claimed to have seen the appellant create any illicit media of MI—she merely said he had used his cell phone while they were engaged in sexual activity and that later he threatened to reveal pictures and videos. There was no reason to believe the appellant's cell phone was anywhere except with the appellant, who was out of the state. There is no evidence that MI claimed that these alleged images were created in the appellant's home or with a device likely to be found in the appellant's home. No one identified any particular device in the appellant's home that would have been a likely place for the appellant to have stored any such videos or images. In short, there was no substantial basis for the CO to conclude there was a fair probability that NCIS would find illicit images or videos of MI in the appellant's house.

During the hearing on the motion, trial counsel attempted to justify the search of the appellant's home at a time when there was no reason to believe that the appellant's cell phone was in the home:

> TC: Special Agent [JJ], you asked for—even though it was—the information you had was that these photos were taken with a cell phone. Why did you ask for the search to [sic] broader than just cell phones?

> Wit: Because cell phones are known to contain media cards capable of storing information and data on them. These media cards can be removed from the cell phone at any time, and they can be stored in a residence anywhere virtually.[27]

Taking this testimony to be true, we find that it does not constitute a substantial basis to find probable cause. It is possible that the appellant could have made illicit pictures and videos on a cell phone in such a way that they were stored on the phone's SD card. It is also possible that the appellant took the SD card out of his phone for some reason. It is possible that the

---

[27] Record at 16.

appellant then stored this SD card somewhere in his home. But probable cause requires more than an assessment that something is possible. It requires a fair probability that evidence will be found in a particular place. Nothing in Special Agent JJ's speculation about what the appellant might have done with his phone's SD card supported a probable cause determination.

The recent Court of Appeals for the Armed Forces (CAAF) case *United States v. Nieto* provides a useful comparison to our case.[28] Specialist Nieto was suspected of using his cell phone to photograph other soldiers while they were using the latrine.[29] Acting on a tip that someone had seen a cell phone and a laptop on Nieto's bunk, a Criminal Investigative Division special agent sought authorization to seize and search the two items.[30] The agent did not have any direct evidence that any files had been transferred to the laptop or even evidence that they could be.[31] The agent supported his request by informing the magistrate that he knew that soldiers used their cell phones to take pictures, and that they normally downloaded those photos to their laptops.[32] The magistrate authorized the agent's search of the laptop on this information, and the military judge denied a motion to suppress.[33]

The CAAF held that the magistrate did not have a substantial basis for his probable cause determination because "there was an insufficient particularized nexus linking Appellant's misconduct to his laptop."[34] The CAAF found that "[Nieto's] cell phone, by itself, had the ability to serve both as the instrumentality of the crime and as a storage device for the fruit of that crime."[35] Therefore, the agent's rationale for searching the laptop was "technologically outdated and was of little value in making a probable cause determination."[36] There was no direct evidence that Nieto had transferred any images to the laptop, and nothing supported a reasonable inference on the magistrate's part that he had.[37] The agent's generalizations about what

---

[28] *See generally Nieto*, 76 M.J. 101.

[29] *Id.* at 103.

[30] *Id.*

[31] *Id.* at 103-04.

[32] *Id.* at 104.

[33] *Id.* at 105.

[34] *Id.* at 103.

[35] *Id.* at 107.

[36] *Id.*

[37] *Id.*

people did with the pictures on their cell phones did not provide a substantial basis for concluding that probable cause existed to seize Nieto's laptop.[38]

The authorization in the appellant's case is not as well supported as the one in *Nieto*. Unlike the agent in *Nieto*, Special Agent JJ could not even identify a particular device that was the proper subject of the search or a reason why such a device would be in the appellant's house. MI had made a generalized contention that the appellant had "other devices in his house, electronic devices capable of storing such media," but this tells us almost nothing about what they might be or why incriminating images might be on them.[39] The most concrete nexus between the requested authorization and potential evidence is the possibility that the appellant removed the SD card from his phone and stored it in his house while he (and his cell phone) were out of state. Special Agent JJ, however, did not provide the CO with any reason to think that was at all probable. The case for probable cause in this case is weaker than the one in *Nieto*.

We have made allowances for the proposition, reinforced recently by the CAAF in *United States v. Eppes*, that a nexus between the alleged criminal activity and a proposed search "may be inferred from the facts and circumstances of a particular case, including the type of crime, the nature of the items sought, and reasonable inferences about where evidence is likely to be kept."[40] We acknowledge that the record may not reflect everything that the CO might have been told. But it is the paucity of the record and the absence of evidence supporting the CO's determination and the military judge's ruling that drive our analysis. Completion of the probable cause picture would require speculation, not reasonable inferences. Even if we credit the CO with every reasonable inference he might have drawn from the information the record shows he had, we still find that there was no substantial basis for his probable cause determination. We find that the military judge abused his discretion by finding otherwise.

## B. Good faith exception

Even though the government failed to show that the CO had probable cause to issue the search authorization, the resulting evidence is still admissible if the government can establish by a preponderance of the evidence that the evidence was subject to the good faith exception to the exclusionary rule.

---

[38] *Id.* at 108.

[39] Record at 14.

[40] *Eppes*, 77 M.J. at 345 (quoting *Nieto*, 76 M.J. at 106).

The good faith exception is governed by MIL. R. EVID. 311(c)(3), which provides as follows:

> (3) *Good Faith Execution of a Warrant or Search Authorization.* Evidence that was obtained as a result of an unlawful search or seizure may be used if:
>
> (A) the search or seizure resulted from an authorization to search, seize or apprehend issued by an individual competent to issue the authorization under MIL. R. EVID. 315(d) or from a search warrant or arrest warrant issued by competent civilian authority;
>
> (B) the individual issuing the authorization or warrant had a substantial basis for determining the existence of probable cause; and
>
> (C) the officials seeking and executing the authorization or warrant reasonably and with good faith relied on the issuance of the authorization or warrant. Good faith is to be determined using an objective standard.[41]

The CAAF recently acknowledged "tension between [its] discussion of the good-faith doctrine" in its case law interpreting this rule.[42] We discern two apparently distinct lines of precedent in the CAAF's case law relevant to determining whether the good faith exception applies. Both lines of precedent have a claim on our statement of the applicable law. The difference between precedents concerns how we interpret MIL. R. EVID. 311(c)(3)(B), which requires the individual issuing the authorization or warrant to have had a substantial basis for determining the existence of probable cause. One precedent, *United States v. Hoffmann*, applies the plain language of the rule.[43] The other, the CAAF's earlier decision in *United States v. Carter*, recasts this prong to ask whether the law enforcement official executing the search believed the person issuing the authorization had a substantial basis to find probable cause.[44] We find that our choice of authorities determines the outcome of this issue. We will address both precedents in our analysis.

---

[41] MIL. R. EVID. 311(b)(2)(A)-(C), SUPPLEMENT TO MCM (2012 ed.).

[42] *Nieto*, 76 M.J. at 108 n.6 (citing *Hoffmann*, 75 M.J. at 127-28, and *Carter*, 54 M.J. at 419-22).

[43] *Hoffmann*, 75 M.J. at 128.

[44] *Carter*, 54 M.J. at 422.

### 1. *United States v. Hoffmann*

In *Hoffmann*, the CAAF applied the plain language of MIL. R. EVID. 311(c)(3) to determine if otherwise excludable evidence qualified for the good faith exception.[45] The CAAF concluded that since "the individual issuing the authorization did not have a substantial basis for determining the existence of probable cause, a requirement for application of the good-faith exception [and thus] the military judge abused her discretion in admitting the fruits of the search of Appellant's digital media."[46] Applying the plain language of the rule to this case as the CAAF did in *Hoffman* is straightforward. Subsection (B) of the rule requires the person who authorized the search to have had a substantial basis for finding probable cause. We have found that the CO did not have a substantial basis for finding probable cause to authorize the initial search of the appellant's home. Therefore, under *Hoffman*, the evidence does not qualify for the exception.

### 2. *United States v. Carter*

*Carter* purports to apply the Supreme Court's seminal good faith case, *United States v. Leon*, to courts-martial.[47] In the civilian context, both the exclusionary rule and the good faith exception to the rule are creations of Supreme Court case law. In *Leon*, the Supreme Court considered the suppression of evidence police gathered while executing a search warrant.[48] Although the warrant was facially valid, the trial court found that its issuance was not supported by probable cause and suppressed the affected evidence.[49] The issue in *Leon* was whether evidence obtained in good faith reliance on a facially valid warrant should be suppressed.

The Court began its analysis expressing a strong preference for—and a resulting deference to—search warrants.[50] A warrant "'provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer engaged in the often competitive enterprise of ferreting out crime.'"[51] The

---

[45] *Hoffmann*, 75 M.J. at 128.

[46] *Id.*

[47] *Carter*, 54 M.J. at 421.

[48] *Leon*, 468 U.S. at 900-05.

[49] *Id.* at 902-04.

[50] *Id.* at 913-14.

[51] *Id.* (quoting *United States v. Chadwick*, 433 U.S. 1, 9 (1977)).

Court's preference for the protections warrants provide "is most appropriately effectuated by according 'great deference' to a magistrate's determination."[52]

Having expressed its preference for search warrants, *Leon* held that, in general, evidence obtained in good faith reliance on a search warrant would not be suppressed. But, as explained by the CAAF in *Carter*, *Leon* listed four circumstances in which the good faith exception was not available to the government:

> (1) False or reckless affidavit—Where the magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth";
>
> (2) Lack of judicial review—Where the magistrate "wholly abandoned his judicial role" or was a mere rubber stamp for the police;
>
> (3) Facially deficient affidavit—Where the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and
>
> (4) Facially deficient warrant—Where the warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.[53]

*Leon*'s good faith exception to the exclusionary rule (and the four exceptions to the exception) reflect the Court's determination that police—not magistrates—are the proper objects of suppression's deterrence.[54] The Court reasoned that magistrates, as neutral and detached judicial officers, "have no stake in the outcome of particular criminal prosecutions."[55] Suppression, then, would not deter a magistrate from making future errors or motivate compliance with the Fourth Amendment.[56] Because the focus is on the police, "evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged

---

[52] *Id.* at 914 (citing *Spinelli v. United States*, 393 U.S. 410 (1969)) (additional citations omitted).

[53] *Carter*, 54 M.J. at 419-20 (citation omitted).

[54] *Leon*, 468 U.S. at 916.

[55] *Id.* at 917.

[56] *Id.*

with knowledge, that the search was unconstitutional under the Fourth Amendment."[57]

In *Carter*, the CAAF attempted to reconcile MIL. R. EVID. 311(c)(3)'s three-pronged good faith test with *Leon*. But this is not easily done. In order for a search to qualify for the good faith exception under the plain language of the rule's second prong, the person issuing the authorization must have had a substantial basis for finding probable cause. This is inconsistent with *Leon,* which held that a search might qualify for the good faith exception even if the magistrate did not have a substantial basis for his determination, so long as the police executing the warrant themselves acted in good faith.[58]

The difference could not be elegantly harmonized. To make it work, the *Carter* court recast the rule's second prong. Where the rule asks whether the *person issuing the authorization* had a substantial basis for finding probable cause, *Carter* changes the question to ask whether *the police executing the search* reasonably believed that the magistrate had a substantial basis for finding probable cause.[59]

In considering MIL. R. EVID. 311(c)(3), *Hoffmann*, and *Carter*, we recognize that we should "exhaust all possibilities of reconciling the two decisions" before committing to one and disregarding the other.[60] But as we have seen, *Carter*'s approach to MIL. R. EVID. 311(c)(3) is inconsistent with the rule's plain language, and *Hoffmann*'s plain-language approach is therefore inconsistent with *Carter*. We have considered whether *Carter* or the CAAF's later decision in *Hoffmann* represents the precedent binding upon this court.[61] Although *Hoffman* is the more recent of the two decisions, the CAAF has cited *Carter* favorably as recently as last year in *United States v.*

---

[57] *Id.* at 919.

[58] *Id.*

[59] *Compare* MIL. R. EVID. 311(c)(3)(B) ("[T]he individual issuing the authorization or warrant had a substantial basis for determining probable cause . . .") *with Carter*, 54 M.J. at 422 ("'Substantial basis' as an element of good faith examines the affidavit and search authorization through the eyes of a reasonable law enforcement official executing the search authorization. In this context, the second prong of MIL. R. EVID. 311(c)(3) is satisfied if the law enforcement official had an objectively reasonable belief that the magistrate had a 'substantial basis' for determining the existence of probable cause.").

[60] BRYAN A. GARNER, ET AL., THE LAW OF JUDICIAL PRECEDENT 301-02 (2016).

[61] *Id.* at 302.

*Darnall*, though it did not perform any analysis of the issue and did not address *Hoffmann*.[62]

We conclude that we are still bound by *Carter*. We are reluctant to assume that the CAAF has tacitly reversed its own precedent. *Hoffmann* made no mention of *Carter* and did not purport to change any precedents binding on this court. The absence of language explicitly overruling *Carter* and the CAAF's recent re-articulation of *Carter*'s good faith test in *Darnall* convince us that we may not disregard this precedent.

Applying *Carter*'s harmonization of *Leon* and MIL. R. EVID. 311(c)(3) to our admittedly limited factual record, we conclude that the initial search of the appellant's residence was done in good faith. There is no question that the rule's first prong is met. The CO had the authority to authorize Special Agent JJ's search of the appellant's on-base residence. The second prong, as modified by *Carter*, asks whether Special Agent JJ reasonably believed that the magistrate had a substantial basis for finding probable cause. We find that she did. Special Agent JJ provided enough specific information to the CO to meet this low standard. She was investigating a specific allegation and was able to articulate reasons why evidence might be found in the appellant's house. We found that this information did not constitute probable cause or even a substantial basis on which to find probable cause. But the case for probable cause is not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[.]"[63]

Special Agent JJ's communication with and apparent reliance on the advice of the appropriate attorneys is an important factor in our resolution of this prong. The CO's probable cause determination would have seemed to be a ratification of what trial counsel and the staff judge advocate had already told Special Agent JJ: probable cause existed to search the appellant's home. The fact that Special Agent JJ knew that the CO, trial counsel, and the staff judge advocate all came to the same conclusion is a compelling reason to find that she reasonably believed that the CO had a substantial basis for that conclusion.

Turning to the third prong, we find that Special Agent JJ reasonably and with good faith relied on the issuance of the authorization. Special Agent JJ did not procure the authorization through the use of any intentionally or

---

[62] *See United States v. Darnall*, 76 M.J. 326, 332 (C.A.A.F. 2017) ("The 'good faith' exception to the exclusionary rule [applies] in cases where the official executing the warrant relied on the magistrate's probable cause determination and the technical sufficiency of the warrant, and that reliance was 'objectively reasonable.'") (quoting *Carter*, 54 M.J. at 419 (citing *Leon*, 468 U.S. at 922)).

[63] *Carter*, 54 M.J. at 419.

recklessly false information. The authorization was sufficiently particular, and Special Agent JJ had articulated a basis for the scope of the search. Again, her request had been vetted by the very lawyers who were responsible for providing her and the CO with legal advice concerning her request. The record contains no evidence of bad faith on the part of Special Agent JJ. We also find no evidence that Special Agent JJ acted with "deliberate, reckless, or grossly negligent disregard" for the appellant's Fourth Amendment rights.[64] We find her reliance on the erroneously granted authorization to be objectively reasonable. All three prongs of MIL. R. EVID. 311(c)(3) having been met, we find that the evidence derived from the initial search of the appellant's home to be admissible under the good faith exception to the suppression rule.

We pause here to discuss the admittedly inconvenient fact that the CAAF found that the search in *Nieto*—a search with a more robust factual predicate than ours—failed the good faith test under both *Hoffmann* and *Carter*. In *Nieto* the CAAF went to some lengths to discuss the deficiencies in the probable cause determination. The court did not, however, explain why it did not find that the agent in that case was acting in good faith reliance on the magistrate's authorization. Was the factual basis for the authorization so poor that the agent could not have relied in good faith on the issuance of the authorization? Should we conclude that the CAAF found that the factual basis for probable cause was so weak that the agent could not have reasonably believed that the magistrate had a substantial basis for finding probable cause? The CAAF does not tell us, and we decline to rely on speculation. Instead, we have applied the rule as interpreted by *Carter*, mindful that the agent—not lawyers or commanders—is the proper subject of our inquiry. In this case the agent took the information she had to the very attorneys she should consult, then to the CO. Her actions in this regard were reasonable, and she reasonably relied on the attorney's legal advice and the CO's authorization.

As the CAAF recently recognized in *Eppes,* the exclusionary rule is "drastic and socially costly" and "should only be applied where needed to deter police from violations of constitutional and statutory protections."[65] Courts, therefore, limit its application "to situations in which this purpose is thought most efficaciously served."[66] Here, excluding the evidence obtained from the search of the appellant's home would provide no deterrent effect on

---

[64] *Davis v. United States*, 564 U.S. 229, 238 (2011) (citing *Herring v. United States*, 555 U.S. 135, 144 (2009)).

[65] *Eppes*, 77 M.J. at 349 (citations and internal quotation marks).

[66] *Davis*, 564 U.S. at 237 (citations and internal quotation marks).

police. The record does not demonstrate falsity or recklessness on the part of Special Agent JJ leading up to the issuance of the authorization. And, "[o]nce the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law . . . [.]"[67] We find that although the military judge erred by finding that the CO had a substantial basis for his probable cause determination, the evidence in question was nevertheless admissible under the good faith exception.

### 3. Should the CAAF reconsider Carter?

The CAAF has recently reminded the service courts of criminal appeals that "it is simply not for the [service courts] to act on the assumption that an opinion of [the CAAF] has been implicitly overruled."[68] If we believe that a later decision has called a precedent into question, our role is "to express that viewpoint and to urge [the CAAF's] reconsideration of [its] precedent[.]"[69] The question of *Carter*'s continued application after *Hoffmann* is a close one. We have concluded that we continue to be bound by *Carter*. Having heeded the CAAF's admonition to adhere to its precedent until that court overrules it, we likewise accept the CAAF's invitation to suggest that a questioned precedent be revisited. We respectfully suggest that *Carter* should be reconsidered.

We make this suggestion for several reasons. In our view, *Carter* represents an unwarranted departure from the rule's plain language. We also believe *Carter* misapprehends the Drafters' Analysis and ignores the case law the drafters relied on when they adapted the good faith exception to military practice.

Our understanding of MIL. R. EVID. 311(c)(3) starts with the rule's text. Military courts "use well-established principles of statutory construction to construe provisions in the Manual for Courts-Martial."[70] Statutory construction begins—and often ends—with the plain language of a rule.[71] The plain language controls unless its use would lead to an absurd result.[72]

The relevant language of the rule is clear: the good faith exception applies if "the individual issuing the authorization or warrant had a substantial basis for determining the existence of probable cause[.]"[73] The language does

---

[67] *Stone v. Powell*, 428 U.S. 465, 498 (1976) (Burger, C.J., concurring).

[68] *United States v. Davis*, 76 M.J. 224, 228 n.2 (C.A.A.F. 2017).

[69] *Id.*

[70] *United States v. Lewis*, 65 M.J. 85, 88 (C.A.A.F. 2007).

[71] *See Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992).

[72] *Id.*

[73] MIL. R. EVID. 311(c)(3)(B).

not provide for the exception's application in cases where the issuing person did not have a substantial basis as long as the police were unaware of the deficiency. Nor is this an absurd result that requires judicial correction. As the rule's meaning is plain and the result is not absurd, this would normally be the end of the analysis. But it is worth addressing the reasons *Carter* gives for its re-write of the rule.

First, the *Carter* court suggested that its alteration of Rule 311(c)(3)(B) was necessary because "[t]o do otherwise would effectively abolish the good faith exception in military practice."[74] The *Carter* court reasoned that since *Gates* required judges to review magistrates' probable cause determinations using the substantial basis test in the first place, the rule's second application of that standard was redundant, and served only to eviscerate the good faith exception. The trial judge considering the good faith exception would necessarily have already found that the probable cause determination lacked a substantial basis, or else the court would not be considering the good faith exception in the first place. If both the probable cause determination and the good faith exception used the same substantial basis test, then no search would ever qualify for the exception.[75] One of the reasons the *Carter* court recast MIL. R. EVID. 311(c)(3)(B), then, was to avoid this superfluous reading of the rule.

Although the CAAF approach is consistent with "the canon against interpreting any statutory provision in a manner that would render another provision superfluous[,]"[76] we do not believe that this canon of construction represents a helpful approach to the rule's text. First, the rule itself is internally consistent. Nothing in any Military Rule of Evidence requires military judges to use the substantial basis test as a standard of review for assessing probable cause determinations. The CAAF's case law, implementing *Gates*, requires military judges to use this standard when reviewing a probable cause determination.[77] But the plain language of Rule

---

[74] *Carter*, 54 M.J. at 421.

[75] *Id.* ("Any search that failed the *Gates* test for reviewing probable cause determinations ('a 'substantial basis for . . . concluding' that probable cause existed') would also fail the test for good faith in Mil. R. Evid. 311(b)(3), because the second prong ('a substantial basis for determining the existence of probable cause') would not be satisfied. If we were to interpret the 'substantial basis' language in Mil. R. Evid. 311(b)(3)(B) as an additional requirement beyond the requirements of *Leon*, the good-faith exception would not be an exception at all, and the language would serve no purpose.").

[76] *See Bilski v. Kappos*, 561 U.S. 593, 607-08 (2010).

[77] *See Rogers*, 67 M.J. at 164-65.

311(c)(3)(B) does not obviate—and is not obviated by—any other rule or part of a rule.

Not only was the rule's language not superfluous with any other rule of evidence, it was not superfluous with the Court of Military Appeals' case law when it went into effect in 1986. The substantial basis test made only sporadic appearances both in the service courts of appeals and the Court of Military Appeals in pre-good faith rule cases.[78] Even after 1983, when the Supreme Court "reaffirm[ed]" the substantial basis test in the context of civilian magistrates in *Gates*,[79] the Court of Military Appeals did not consistently use the substantial basis test to review probable cause determinations until 1992.[80] We conclude from this that the drafters would not have understood their rule to operate in an environment where the military judge had already asked the substantial basis question. The drafters were familiar with *Gates*, but intended for the *Gates* substantial basis question to be part of the new good faith test.

*Carter*'s second objection to a plain-language understanding of the rule is that the Drafters' Analysis of the rule indicates that the rule's purpose is to incorporate *Leon*'s good faith exception into court-martial practice.[81] Since *Leon* makes the good faith exception available in cases where the magistrate

---

[78] *See e.g. United States v. Walters*, 48 C.M.R. 1, 3 (C.M.A. 1973) ("If there is a substantial basis in the affidavit to support Colonel Maline's determination that such probability existed, we will not overrule his judgment.") (citations and internal quotation marks omitted)); *United States v. Bradley*, 50 C.M.R. 608, 614 (N.C.M.R. 1975) ("[W]here a search for contraband or evidence of a crime is authorized by a commanding officer, appellate courts will sustain his determination to authorize the search so long as there was in the information presented to him a substantial basis for him to conclude that contraband or evidence of a crime was probably present on the person or at the place to be searched.") (citations omitted)). *But see e.g. United States v. Hood*, 7 M.J. 128, 129-30, (C.M.A. 1979); *United States v. Gill*, 48 C.M.R. 792, 794 (C.M.A. 1974) (*de novo* reviews of probable cause determination).

[79] *Gates*, 462 U.S. at 237,

[80] *Compare United States v. Moore,* 23 M.J. 295, 297-99 (C.M.A. 1987) *and United States v. Queen*, 26 M.J. 136, 139 (C.M.A. 1988) (conducting apparent *de novo* review of commander's probable cause determination) *with United States v. Figueroa*, 35 M.J. 54, 56 (C.M.A. 1992) (applying substantial basis test to commander's probable cause determination); *accord United States v. Thompson*, 30 M.J. 577, 579 (A.C.M.R. 1990) ("The standard of review of the 'substantial basis' determination has not been addressed before by us.").

[81] *Carter*, 54 M.J. at 420.

lacked a substantial basis for finding probable cause, the rule must mean that as well.[82]

We respectfully suggest two answers to this second objection. First, since the language of the rule is plain, there is no need to resort to the Drafters' Analysis to inquire into the President's intent. In the words of Chief Justice Marshall, "a law is the best expositor of itself[.]"[83] And while the Drafters' Analysis presents the intent of the drafting committee, it is not part of the Manual for Courts-Martial. "[T]he Drafters' Analysis, when it does not corroborate the plain language of the rule, is of questionable precedential weight."[84]

The second (and longer) response is that even if we were to take the Drafters' Analysis as binding, the purported intent of the drafters is not so irreconcilable with the plain language of the rule as to require that the rule be judicially altered as it was in *Carter*. The relevant portion of the Drafters' Analysis states: "[Rule 311(c)(3)] was added in 1986 to incorporate the 'good faith' exception to the exclusionary rule based on *United States v. Leon . . .* and *Massachusetts v. Sheppard . . .* [.]"[85] The good faith exception is a judicial creation, and *Leon* is the case that created it. (*Sheppard*, decided the same day as *Leon*, does not add substantially to the doctrine announced in *Leon*).[86] It is reasonable to accept that any subsequent codification of the exception—even one that differs from *Leon* in some particular—is *based* on *Leon*. We think it is fair to say that the plain-language understanding of the rule endorsed by the CAAF in *Hoffmann* is based on—though not identical to—*Leon*.

More compellingly, a closer look at the Drafters' Analysis reveals the drafters' rationale for the rule as it is written. The analysis begins by stating that *Leon*'s determination "that the deterrence basis of the exclusionary rule does not apply to magistrates extends with equal force to search or seizure authorizations issued by commanders *who are neutral and detached . . . .*"[87] But not all commanders are neutral and detached. The analysis, and the case law it cites, correctly notes that commanders "cannot be equated constitutionally to magistrates. As a result, commanders' authorizations may be *closely scrutinized* for evidence of neutrality in deciding whether this

---

[82] *Id.*

[83] *Pennington v. Coxe*, 6 U.S. 33, 52, (1804).

[84] *United States v. Taylor*, 64 M.J. 416, 422 (C.A.A.F. 2007) (Ryan, J., dissenting).

[85] MCM, App. 22, at A22-20.

[86] *See generally Mass. v. Sheppard*, 468 U.S. 981 (1984).

[87] MCM, App. 22 at A22-20 (emphasis added).

exception will apply."[88] In *United States v. Stuckey*,[89] one of the cases the drafters rely on for this proposition, the Court of Military Appeals drew the magistrate-commander distinction even more sharply: commanders are not similarly situated with *Leon*'s neutral magistrates, uninvolved in "the often competitive enterprise of ferreting out crime."[90] Rather, "[a] military commander has responsibilities for investigation and for law enforcement that a magistrate does not possess."[91] Therefore, "the likelihood that a search and seizure will withstand subsequent attack in court is—and should be— greater when a judicial officer trained in the law has made the determination of probable cause than when a commander does so."[92]

Since the rule's drafters and the cases they relied on acknowledge that commanders are not magistrates and that in some instances they deserve less deference, it would be surprising if the rule the drafters created for the military were exactly the same as the one announced in *Leon*. One would expect to find some scrutiny of the authorizing officer in the rule. And there we find it: a search based on a commander's erroneous probable cause determination cannot qualify for the good faith exception if it was made without even a substantial basis for the finding.

We find the plain language of the rule to be consistent with the Drafters' Analysis. The good faith rule is based on *Leon* but tweaked to account for the differences between commanders, who have substantial law enforcement responsibilities, and *Leon*'s neutral and detached magistrates. These differences had already been recognized by the Court of Military Appeals and were taken into account by the rule's drafters. The differences are reflected in the second prong of the good faith test, which asks if there was even a substantial basis supporting the authorizing officer's erroneous probable cause determination. If there was not, the exception does not apply. None of this requires *Carter*'s drastic re-interpretation of the rule's plain language. Are we bending the Drafters' Analysis to fit the plain language of the rule? We don't think so. But even if our construal of the Drafters' Analysis is wrong, we would still counsel adherence to the rule's plain language.

We respectfully suggest that the CAAF resolve the tension between *Carter* and *Hoffmann* in favor of *Hoffmann* and the plain language of MIL. R. EVID. 311(c)(3).

---

[88] *Id.* (emphasis added).

[89] 10 M.J. 347 (C.M.A. 1981).

[90] *Leon*, 468 U.S. at 914.

[91] *Stuckey*, 10 M.J. at 359.

[92] *Id.* at 365.

## C. Judicial notice of the status of Marine Corps Air Station Yuma Station Order P5510.8G as a lawful general order

This assignment of error concerns the appellant's conviction for violating Station Order P5510.8G, requiring all persons introducing firearms onto Marine Corps Air Station Yuma to register them with the base provost marshal. The appellant contends that the military judge erred by taking judicial notice of the relevant order's status as a lawful general order. We disagree.

Before trial, the military judge announced his intention to take judicial notice that the station order was a lawful general order applicable to the appellant.[93] The civilian defense counsel said that he had no objection.[94] At the end of the case, however, the civilian defense counsel told the military judge he did not believe that the evidence supported a conclusion that the order had been properly published. He explained his lack of objection to judicial notice by telling the military judge that he had listened carefully to the military judge's description of the judicial notice and that the fact of the order's publication was not part of what the military judge had judicially noticed.

A military judge may take judicial notice of a fact if it is generally known universally, locally, or in the area pertinent to the event, or if it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.[95] As an initial matter, we disagree with the contention that Station Order P5510.8G had to have been published to qualify as a general order. The Manual for Courts-Martial requires that orders and regulations of the President, Secretary of Defense, Secretary of Homeland Security, and service secretaries be published in order to qualify as general orders or regulations. Orders and regulations of general court-martial convening authorities such as the one who signed this order must be "issued" in order to qualify as a general order or regulation.[96] Having drawn this distinction, we note that the purpose of publication and issuance are the same: to provide those subject to the order with sufficient opportunity to

---

[93] Record at 333.

[94] *Id.* at 334.

[95] MIL. R. EVID. 201(b).

[96] *See* MCM, Part IV, ¶ 16c(1)(a).

learn of it. Otherwise, service members do not have a fair opportunity to conform their conduct to the order.[97]

Additionally, civilian defense counsel could not have agreed that the order was a general order while contending that it had not been properly issued. The Manual defines a general order as an order that has been *issued* by a general court-martial convening authority.[98] By agreeing that the order was a general order, civilian defense counsel necessarily agreed that it had been issued.

Civilian defense counsel arguably waived any objection to the military judge taking judicial notice that the order was a lawful general order.[99] But because he may have been confused about what he was agreeing to when he did not object, we will treat the failure to object as forfeiture and test for plain error. The plain error standard is met when: (1) an error was committed; (2) the error was plain, or clear, or obvious; and (3) the error resulted in material prejudice to substantial rights.[100] The plain error doctrine is "to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."[101]

The appellant argues that the military judge erred by taking judicial notice because there was a reasonable dispute as to whether the order had been published, and the military judge lowered the government's burden of proof by taking judicial notice. Assuming without deciding that there was a reasonable dispute over whether the order was properly issued, we find that any error was not plain or obvious. A general order is a proper subject of judicial notice.[102] The order is facially valid and includes a reference to a distribution list. An order is entitled to a presumption of regularity if it appears regular on its face.[103] Accepting the order as a lawful general order

---

[97] *United States v. Tolkach*, 14 M.J. 239, 242 (C.M.A. 1982) ("Obviously, a commander cannot sign a regulation, put it in his desk drawer, and then expect his subordinates to be presumed to have knowledge of it.").

[98] *See* MCM, Part IV, ¶ 16c(1)(a).

[99] *See United States v. Campos*, 67 M.J. 330, 332-33 (C.A.A.F. 2009).

[100] *United States v. Maynard*, 66 M.J. 242, 244 (C.A.A.F. 2008). *See also United States v. Sweeney*, 70 M.J. 296 (C.A.A.F. 2011) (admission of cover memorandum and specimen custody document certification from drug lab violated Confrontation clause; error was plain and obvious).

[101] *United States v. Causey*, 37 M.J. 308, 311 (C.M.A. 1993) (citations and internal quotation marks omitted).

[102] *See United States v. Wales*, 31 M.J. 301, 309 (C.M.A. 1990).

[103] *United States v. Ayers*, 54 M.J. 85, 91, (C.A.A.F. 2000).

applicable to the accused at the time of the offense was not plain or obvious error.

Nor do we find that the military judge's decision to judicially notice the nature of the order lowered the government's burden of proof. The military judge correctly instructed the members on the burden of proof and told the members that they may, but need not, accept his judicial notice as adequate proof. We have no reason to doubt that the members followed the military judge's instructions. This assignment of error is without merit.

## D. Legal and factual sufficiency

The appellant argues that his conviction for failure to obey Station Order P5510.8G is legally and factually insufficient. We disagree.

We review issues of legal and factual sufficiency *de novo*.[104] The test for legal sufficiency is whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact finder could have found all the essential elements beyond a reasonable doubt.[105] In weighing questions of legal sufficiency, we draw every reasonable inference from the evidence in the record in favor of the prosecution.[106] The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are ourselves convinced of the accused's guilt beyond a reasonable doubt.[107]

In order to convict the appellant of failing to obey a lawful general order, the government had to prove: (1) that there was in effect a certain lawful general order; (2) that the accused had a duty to obey it; and (3) that the accused violated or failed to obey the order.[108]

The government produced the order. Facially, it contained no irregularities. It contained a reference to a distribution list and was forwarded to the provost marshal, who maintained a copy of this order in his binder and incorporated it into the base indoctrination brief to new arrivals. The military judge took judicial notice of the order, its status as a lawful general order, and its application to the appellant. The government presented eyewitness testimony that the appellant possessed firearms at his on-base

---

[104] Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)).

[105] *United States v. Humphreys*, 57 M.J. 83, 94 (C.A.A.F. 2002).

[106] *See United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001).

[107] *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

[108] MCM, Part IV, ¶ 16b(1)(a)-(c).

residence and that at least four of them were not registered during the charged time period.

A reasonable trier of fact could find on this evidence that the appellant violated a lawful general order as charged. We have also considered the evidence, and we are convinced of the appellant's guilt beyond a reasonable doubt. This assignment of error is without merit.

### III. CONCLUSION

The findings and sentence are affirmed.

Senior Judge HUTCHISON concurs.


SAYEGH, Judge (concurring in part and dissenting in part):

I concur with the opinion of the court as to its resolution of Assignments of Error II and III, the conclusion that *United States v. Carter*, 54 M.J. 414 (C.A.A.F. 2001), continues to be binding precedent that the court must follow in this case, and with the majority's suggestion that the Court of Appeals for the Armed Forces (CAAF) reexamine *Carter* in favor of following the plain language of MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 311(c)(3), SUPPLEMENT TO MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). With respect to the court's resolution of the good faith exception question, I would find that the government did not establish that the good faith exception applies, even under *Carter*'s more generous test for good faith.

The government has the burden of establishing the good faith exception contained in MIL. R. EVID. 311(c)(3) by a preponderance of the evidence. *See* MIL. R. EVID. 311(d)(5)(A). MIL. R. EVID. 311(c)(3) establishes three prongs that must be met; one of which requires the individual who issues the search authorization to have a substantial basis for determining the existence of probable cause. Following the CAAF decision in *Carter*, when assessing for good faith, we instead look at the authorization "through the eyes of a reasonable law enforcement official executing the search authorization" to see if she "had an objectively reasonable belief that the [CO] had a 'substantial basis' for determining the existence of probable cause." *Carter*, 54 M.J. at 422.

The agent claims she provided the commanding officer (CO) with all known facts, but the limited record available to us does not establish with any level of detail what information she passed.[1] At trial, the agent admitted her memory of the phone conversation she had with the CO was hindered by

---

[1] Record at 12.

the passage of time.[2] The record contains no specific indication that the agent informed the CO that MI was unable to confirm whether the videos ever existed, or how the agent came to the conclusion that the videos would "likely" be found in the appellant's home.[3] The majority considered it an important factor that the agent had obtained and relied on legal advice of the appropriate attorneys. However, the only evidence of this advice on the record is through the agent testifying that she informed the CO that she "consulted" two judge advocates.[4] We are thus left to presume what the legal advice to the agent was.

Indeed, the most reliable evidence of what information was passed to the CO comes from the CO's affidavit contained within Appellate Exhibit IV that was specifically prepared by the government to present as evidence during the suppression motion at trial. The affidavit suggests the agent provided nothing more than a "bare bones"[5] recitation of MI's allegations, which in turn the agent used to support her conclusion that the videos would likely be found in the appellant's home. Had Special Agent JJ conveyed the extent to which MI's allegations were uncorroborated, the CO would have been unlikely to grant the authorization. I conclude, therefore, that this tends to show that Special Agent JJ did not act in good faith when she briefed the CO. I am not persuaded that the agent did not withhold information that would have allowed the CO to make an independent decision based on the totality of the circumstances. *United States v. Monroe*, 52 M.J. 326, 331 (C.A.A.F. 2000) (citing *Illinois v. Gates*, 462 U.S. 213, 239 (1983)).

If the agent recklessly provided only selective detail in obtaining the search authorization, this conduct is appropriately deterred by imposition of the exclusionary rule. Based on the limited facts available to us, I would find that the government has failed to establish by a preponderance of evidence that the good faith exception applies. The military judge therefore abused his discretion in denying the appellant's motion to suppress.

I would find that the requirements of MIL R. EVID. 311(c)(3) were not met, and I would set aside Additional Charge III and its sole specification and the sentence and return the case to the Judge Advocate General for remand to an appropriate convening authority with a rehearing authorized.

---

[2] *Id.* at 24.

[3] Appellate Exhibit IV at 7.

[4] Record at 14.

[5] *Carter*, 54 M.J. at 422.

For the Court



R.H. TROIDL
Clerk of Court